ESTATE OF Sarah M. HEGARTY, deceased,
by Jeremiah J. Hegarty, Special Administrator,
Jeremiah J. Hegarty and Mary D. Hegarty,
Plaintiffs-Respondents-Cross-Appellants,

v.

Angela BEAUCHAINE, M.D.,
Defendant-Appellant-Cross-Respondent,†

OHIC INSURANCE COMPANY,
a foreign insurance corporation,
Defendant-Co-Appellant-Cross-Respondent.†

Court of Appeals

*No. 2004AP3252. Submitted on briefs June 6, 2006.
—Decided October 10, 2006.*

2006 WI App 248

(Also reported in 727 N.W.2d 857.)

† Petitions to review denied 3/14/07.

On behalf of the defendants-appellants-cross-respondents Angela Beauchaine and OHIC Insurance Company, the cause was submitted on the briefs of *Patrick J. Knight* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown* of Milwaukee, and *John S. Skilton, Christopher G. Hanewicz* and *Gabrielle E. Bina* of *Heller Ehrman LLP* of Madison.

On behalf of the defendant-co-appellant-cross-respondent OHIC Insurance Company, the cause was submitted on the briefs of *Emile H. Banks, Jr.,* and *Vicki L. Arrowood* of *Emile Banks & Associates, LLC,* of Milwaukee.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of *William M. Cannon, Sarah F. Kaas* and *Edward E. Robinson of Cannon & Dunphy,* of Brookfield.

Before Fine, Curley and Nettesheim, JJ.

¶ 1. CURLEY, J. This is an appeal and cross-appeal in a wrongful death and medical malpractice action following a jury verdict in favor of the Estate of Sarah M. Hegarty (Sarah) and her surviving parents, Jeremiah J. Hegarty and Mary D. Hegarty (collectively, the Hegartys), and against Dr. Angela Beauchaine, M.D., and her insurance company, OHIC Insurance Company (OHIC).

¶ 2. This case consists of: (1) an appeal by OHIC, from the judgment; jury verdict; all findings, rulings and orders made during pretrial proceedings, during trial and regarding post-verdict motions; (2) a combined appeal by OHIC and Dr. Beauchaine (collectively, Beauchaine/OHIC) from the judgment; jury verdict; all findings, rulings and orders made during pretrial proceedings, during trial and regarding post-verdict motions; and (3) a cross-appeal by the Hegartys from the judgment.

¶ 3. OHIC contends that: (1) the Wisconsin Patients Compensation Fund's (the Fund)[1] liability for negligence assessed against Dr. Beauchaine is triggered after OHIC's primary policy is exhausted; (2) the trial court erred with respect to the special verdict form in: (a) instructing the jury to answer the damage question only if it had answered "yes" to one or more of the preceding cause questions; (b) refusing to include a question inquiring as to whether Dr. Beauchaine was (i) a loaned or borrowed employee, (ii) conducting the business of a health care provider; (3) counsel for OHIC should not have been denied the right to participate in the trial; (4) OHIC was entitled to copies of a settlement agreement that the plaintiffs entered into with settling defendants; and (5) the trial court erred in reading jury instructions on damages prior to the testimony of plaintiff Jeremiah Hegarty.

¶ 4. We conclude that the trial court did not err: (1) in granting declaratory judgment that the Fund's liability was not triggered until OHIC's primary and umbrella policies were exhausted; (2) with respect to the special verdict form in: (a) instructing the jury

---

[1] Now known as Wisconsin Injured Patients and Families Compensation Fund.

to answer the damage question only if it answered one or more of the preceding cause questions "yes"; (b) failing to include a question inquiring as to whether Dr. Beauchaine was (i) a loaned or borrowed employee, (ii) conducting the business of a health care provider; (3) in denying counsel for OHIC the right to participate at trial; and (4) in reading jury instructions on damages prior to the testimony of Jeremiah Hegarty, and affirm with respect to these issues raised in OHIC's appeal. We further conclude that the trial court erred in refusing to order production of the settlement agreement, and therefore reverse and remand this issue to the trial court and order the release of the agreement to OHIC.

¶ 5. Beauchaine/OHIC contend that: (1) the trial court erred in ruling that WIS. STAT. § 893.55(4) (2003–04)[2] did not apply to Dr. Beauchaine; (2) the trial court erred in permitting an uncapped pre-death award of loss of society and companionship damages to Sarah's parents because: (a) the Hegartys were not entitled to separate awards for pre- and post-death loss of society and companionship; (b) even if the Hegartys' pre-death loss of society and companionship claim was recoverable, it was capped by the wrongful death statute and WIS. STAT. § 898.55(4)(b); and (c) the Hegartys' pre-death claim was not recoverable because it was based upon their own pain and suffering; (3) the issue of Dr. Beauchaine's comparative fault was not fairly tried because the trial court erroneously: (a) excluded evidence regarding the causal negligence prior to March 20, 1996, (b) excluded evidence regarding possible negligence after 7:00 a.m. on March 21, 1996; and (c) excluded the testimony of Drs. Lewis and Kalt, and

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

limited the testimony of Dr. Schmidt; (4) the trial court erroneously permitted Dr. Hagen to offer expert testimony; (5) the trial court erroneously excluded evidence relating to Dr. Beauchaine's employment file; (6) the trial court erroneously excluded the Medical College of Wisconsin (the Medical College) from the special verdict form; and (7) the trial court committed cumulative errors that necessitate a new trial in the interests of justice.

¶ 6. We conclude that the trial court did not err: (1) in ruling that WIS. STAT. § 893.55(4) did not apply to Dr. Beauchaine; (2) in permitting an uncapped pre-death award for loss of society and companionship to Sarah's parents because: (a) the Hegartys were entitled to separate pre- and post-death loss of society and companionship awards, (b) the Hegartys' pre-death loss of society and companionship claim is not capped by the wrongful death statute or § 893.55(4)(b), and (c) the Hegartys' pre-death claim is recoverable because it was not based upon their own pain and suffering; (3) in excluding evidence regarding the alleged causal negligence prior to March 20, 1996, excluding evidence regarding possible negligence after 7:00 a.m. on March 21, 1996, excluding the testimony of Drs. Lewis and Kalt, and limiting the testimony of Dr. Schmidt; (4) in permitting Dr. Hagen's testimony, because the court issued a curative instruction; (5) in excluding evidence relating to Dr. Beauchaine's employment file; and (6) in excluding the Medical College from the special verdict form. Because the trial court did not err, no new trial is required in the interests of justice. We therefore affirm with respect to the issues raised in Beauchaine/OHIC's appeal.

¶ 7. The Hegartys contend that: (1) the trial court erred in reducing the damage awards against Dr.

Beauchaine and OHIC by 25%, representing the causal negligence attributed to dismissed party Dr. Stremski because, since Dr. Beauchaine and OHIC are jointly and severally liable for 100% of the damages, and the Hegartys' settlement agreement was not pursuant to a *Pierringer*[3] release, Dr. Beauchaine and OHIC are entitled to a credit of only $840,046.33—the amount they would be entitled to recover from Dr. Stremski in a contribution action; (2) the trial court erred in limiting the Hegartys' recovery of past medical expenses to the amount paid by involuntary plaintiff Milwaukee County, because WIS. STAT. § 893.55(7) has no application outside of WIS. STAT. ch. 655, and therefore does not apply to Dr. Beauchaine; and (3) the trial court erred in refusing to assess statutory interest against OHIC pursuant to WIS. STAT. § 628.46.

¶ 8. We conclude that the trial court did not err: (1) in limiting the Hegartys' recovery of past medical expenses to the amount paid by involuntary plaintiff Milwaukee County, because WIS. STAT. § 893.55(7) was properly applied, in light of the fact that Dr. Stremski was a WIS. STAT. ch. 655 health care provider; and (2) in refusing to assess statutory interest against OHIC pursuant to WIS. STAT. § 628.46, because the Hegartys do not satisfy the *Kontowicz*[4] test, and therefore, affirm with regard to these issues raised in the Hegartys' cross-appeal. We further conclude that because the trial court erred in refusing to order production of the settlement agreement and we are ordering the production of the agreement, we must also

---

[3] *See Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

[4] *Kontowicz v. American Standard Ins. Co. of Wis.*, 2006 WI 48, ¶ 48, 290 Wis. 2d 302, 714 N.W.2d 105.

reverse and remand to the trial court the issue of whether the trial court properly reduced the damage awards against Dr. Beauchaine and OHIC by 25%, to be determined based on the terms of the agreement, because at this time the Hegartys are estopped from making the claim in light of their refusal to release the settlement agreement.

## I. BACKGROUND.

¶ 9. In 1992, at age twelve, Sarah became a patient of Dr. Mary Jo Zimmer, a pediatrician. In 1995, Sarah experienced abdominal pain and consulted Dr. Zimmer. Dr. Zimmer referred Sarah to a pediatric gastroenterologist at Children's Hospital of Milwaukee (Children's), who diagnosed Sarah with irritable bowel syndrome.

¶ 10. On March 20, 1996, Sarah was brought to the emergency room at Children's with severe abdominal pain. She was seen by Dr. Ernest Stremski, an emergency room physician who, after consulting with Dr. Balint, a pediatric gastroenterologist, and Dr. Zimmer, prescribed treatment and suggested sending Sarah home. At her father's insistence, Sarah was admitted to Children's.

¶ 11. Once admitted, Sarah was treated by Dr. Beauchaine. At the time, Dr. Beauchaine was an unlicensed first-year pediatric resident at Children's. She was enrolled in a medical training program at the Medical College and assigned to Children's through the Medical College and the Medical College of Wisconsin Affiliated Hospitals, Inc. (MCWAH), her specific employer.

¶ 12. Dr. Beauchaine, who treated Sarah until the following morning, diagnosed Sarah with constipation, did not conduct a surgical consultation, and called her a

90

"whiner." There was conflicting testimony as to whether Dr. Beauchaine followed Children's protocol, which required that the third-year senior resident in charge of the floor, Dr. Elizabeth Hagen, oversee the treatment of patients by unlicensed residents. It is undisputed that Dr. Beauchaine's diagnosis of constipation was a misdiagnosis, and that no licensed physician actually saw Sarah until 7:30 a.m. the following morning. That morning, Sarah was examined by Dr. Zimmer, Dr. Balint, and Dr. Thomas Puetz, none of whom departed from the original diagnosis of constipation. By 11:45 a.m., Sarah's condition was critical, and at 1:45 p.m. she was taken into surgery, when she was diagnosed with small bowel volvulus with complete bowel infarction, that is, her small bowel had twisted, cutting off the blood supply. Over the next two years, Sarah underwent eighty-nine surgical procedures, including two organ transplants. Sarah died on March 16, 1998, at the age of seventeen. The cost of her care during the two years exceeded $3,200,000.

¶ 13. On December 17, 1998, the Hegartys filed an action setting forth survival claims under WIS. STAT. § 895.01(1), on behalf of Sarah's estate, and wrongful death claims under WIS. STAT. § 894.04, on their behalf as Sarah's parents. The complaint named as defendants: Dr. Beauchaine, Dr. Stremski, Children's, the Medical College, and MCWAH, their respective liability insurers, OHIC and Physicians Insurance Company of Wisconsin, Inc. (PIC), and the Fund. The complaint also named Milwaukee County, Jeremiah Hegarty's employer, and thus, Sarah's insurer, as an involuntary plaintiff.

¶ 14. OHIC had issued both a primary liability policy with a limit of $400,000, and an umbrella policy with a limit of $20 million, to Children's. OHIC retained separate counsel to represent its various insureds, including Dr. Beauchaine and Children's.

¶ 15. On April 21, 2000, the Hegartys filed a motion for a declaratory judgment that Children's, MCWAH and Dr. Zimmer were vicariously liable for Dr. Beauchaine under the doctrine of *respondeat superior.* The trial court dismissed the claims, and the Hegartys appealed to this court. *See Estate of Hegarty ex rel. Hegarty v. Beauchaine (Hegarty I),* 2001 WI App 300, 249 Wis. 2d 142, 638 N.W.2d 355. Before this court heard the appeal, the Hegartys dismissed their vicarious liability claims against Children's.

¶ 16. In *Hegarty I,* this court concluded that a genuine issue existed as to a number of material facts and that conflicting inferences could be drawn from the undisputed facts, requiring a trial to resolve whether Dr. Beauchaine was a servant of MCWAH and whether Dr. Beauchaine was a borrowed employee.[5] *Id.,* ¶¶ 2, 57–78.

¶ 17. Upon remand,[6] on March 26, 2004,[7] Dr. Beauchaine moved for declaratory judgment that the Hegartys' claims against her were subject to the caps on noneconomic damages set forth in WIS. STAT.

---

[5] On December 20, 1999, the Hegartys filed an amended complaint seeking to add Dr. Zimmer and her insurer as defendants, asserting that Dr. Zimmer's role in Sarah's care was not known until her deposition was taken. The trial court dismissed the claim with prejudice based on the statute of limitations, WIS. STAT. § 893.55. The Hegartys appealed this dismissal, along with their vicarious liability claim in *Estate of Hegarty ex rel. Hegarty v. Beauchaine (Hegarty I),* 2001 WI App 300, 249 Wis. 2d 142, 638 N.W.2d 355. This court concluded that the Hegartys' claim against Dr. Zimmer was properly dismissed on statute of limitations grounds. *Id.,* 249 Wis. 2d 142, ¶ 2, 14–27, 82–89.

[6] On May 27, 2003, the case was assigned to the Honorable Michael D. Guolee. All proceedings prior *Hegarty I,* were heard by the Honorable Francis T. Wasielewski.

[7] This date was after the deadline for dispositive motions, but the court nonetheless agreed to hear it.

§ 893.55(4). On May 4, 2004, the trial court denied the motion based on this court's holding in *Phelps v. Physicians Insurance Co. of Wisconsin, Inc.*, 2004 WI App 91, 273 Wis. 2d 667, 681 N.W.2d 571, that first-year medical residents are not health care providers under Wis. Stat. ch. 655, and thus, not subject to the caps of 893.55(4). *Phelps*, 273 Wis. 2d 667, ¶ 41.

¶ 18. On April 14, 2004, the Fund sought a declaratory judgment that two policies of liability insurance issued by OHIC for Children's covered Dr. Beauchaine, and that OHIC's combined liability limit of $20,400,000 must be exhausted before the Fund has exposure for any liability of Dr. Beauchaine. On June 16, 2004, the trial court issued an order granting the motion, based on OHIC's responses to a request for admissions in 2000, admitting that Children's $20 million umbrella policy through OHIC provided coverage to Dr. Beauchaine.

¶ 19. On October 1, 2004, the eve of trial, the Hegartys entered into a settlement agreement with the Medical College, the Fund, and several physicians employed by Children's, including Drs. Stremski and Balint.

¶ 20. The trial began on October 4, 2004, and lasted for three weeks. At the close of evidence, Children's and MCWAH were dismissed by directed verdict,[8] leaving only Dr. Beauchaine and OHIC. The special verdict form asked the jury to determine whether Drs. Stremski, Balint, Zimmer, Beauchaine, and Hagen were negligent, and, if so, whether the negligence was the cause of Sarah's injuries and death.

¶ 21. On October 21, 2004, the jury returned a verdict in favor of Sarah's estate and the Hegartys. The

---

[8] Children's was dismissed by order dated November 9, 2004, and MCWAH was dismissed by order dated November 17, 2004.

jury found Dr. Beauchaine and Dr. Stremski negligent with respect to Sarah's care and treatment, and that their negligence was the cause of Sarah's injuries and death.[9] The jury attributed 75% of the negligence to Dr. Beauchaine and 25% of the negligence to Dr. Stremski. The jury awarded the following sums of money: (1) $13,321.53 (answered by the court) to Sarah's estate for funeral and burial expenses; (2) $7,000,000 in noneconomic damages to the estate for Sarah's pain and suffering; (3) $3,196,863.78 (answered by the court) to the Hegartys for hospital, medical and treatment expenses; (4) $3,500,000 to Mary Hegarty for the loss of Sarah's society and companionship from March 20, 1996, until her death on March 16, 1998; (5) $3,500,000 to Jeremiah Hegarty for the loss of Sarah's society and companionship from March 20, 1996, until her death on March 16, 1998; and (6) $150,000 to the Hegartys for the loss of Sarah's society and companionship resulting from their daughter's death—a total of $17,360,184.31.

¶ 22. Following the verdict, the Hegartys, Dr. Beauchaine and OHIC all filed post-verdict motions. The trial court heard the motions on December 6, 2004. Dr. Beauchaine's and OHIC's motions were denied. The Hegartys motions were granted in part and denied in part.

¶ 23. On December 14, 2004, the trial court issued an order for judgment in the amount of $19,002,754.29. The court ordered that Sarah's estate recover $7,959,444.06, comprised of: the verdict award of $7,000,000 for Sarah's pain and suffering, plus the verdict award of $13,321.53 for funeral and burial expenses,

---

[9] The jury found Dr. Balint's treatment of Sarah to be negligent; however, the jury did not find this negligence to be the cause of Sarah's injuries and death. The jury did not find Dr. Zimmer's and Dr. Hagen's treatment to be negligent.

minus $1,753,330.38, representing a 25% credit for the negligence the jury attributed to Dr. Stremski, plus 12% statutory interest pursuant to Wis. Stat. § 807.01, in the amount of $2,699,452.91. The court ordered that Sarah's parents recover $11,043,310.23, comprised of: the verdict award of $3,500,000 to each parent for the pre-death loss of Sarah's society and companionship, plus the verdict award of $150,000 for the post-death loss of Sarah's society and companionship, plus a remitted verdict award of $2,580,608.14 for past medical expenses in the total amount paid by involuntary plaintiff Milwaukee County, minus $2,432,652.04, representing a 25% credit for the negligence the jury attributed to Dr. Stremski, plus 12% statutory interest pursuant to § 807.01 in the amount of $3,745,354.13. On December 29, 2004, the judgments were perfected and judgment was entered in favor of Sarah's estate in the amount of $8,072,442.88, and in favor of the Hegartys in the amount of $11,193,830.17.[10] This appeal follows. More facts will be set forth in the analysis section of this opinion as necessary.

## II. Analysis.

¶ 24. This opinion addresses three appeals: OHIC appeals in a separate appeal,[11] OHIC and Dr.

_____

[10] The $8,072,442.88 awarded to Sarah's estate was comprised of the $7,959,444.06 total calculated on December 14, 2004, plus $96,841.36 in interest that had accrued since that date, as well as tax in the amount of $16,157.46. The $11,193,830.17 awarded to the Hegartys was comprised of the $11,177,672.71 calculated on December 14, 2004, plus $134,362.48 in interest that had accrued since that date, and tax in the amount of $16,157.46.

[11] The Hegartys begin their response to OHIC's appeal by arguing that OHIC, as its interests relate to Children's, lacks standing as a party to this appeal because its insured,

Beauchaine appeal in a combined appeal (collectively Beauchaine/OHIC), and the Hegartys cross-appeal. We address each appeal in turn.

*A. OHIC's Appeal*

 *1. The Fund's Liability for Dr. Beauchaine's Negligence*

¶ 25. OHIC contends that the Fund's liability for negligence assessed against Dr. Beauchaine is triggered after OHIC's primary policy is exhausted.

¶ 26. In September of 2000, OHIC responded to the Hegartys' request for admissions dated August 2, 2000. In its response, OHIC admitted that Dr. Beauchaine was insured under OHIC's umbrella policy, with a liability limit of $20 million.[12] On April 14, 2004,

Children's, was dismissed. We disagree. Whether a party has standing presents a question of law that this court reviews *de novo*. *Lake Country Racquet & Athletic Club Inc., v. Village of Hartland*, 2002 WI App 301, ¶ 13, 259 Wis. 2d 107, 655 N.W.2d 189. While Children's was dismissed from the case, OHIC was not. The judgment was entered against Dr. Beauchaine and OHIC, and the Hegartys' appeal asserts that OHIC's policies cover Dr. Beauchaine. As such, OHIC had an interest in the outcome of this litigation and has standing to pursue this appeal. We therefore reach the merits of OHIC's arguments.

[12] On August 2, 2000, the Hegartys provided OHIC, Dr. Beauchaine and Children's requests for admission. In September 2000, OHIC, Dr. Beauchaine and Children's responded to the requests. OHIC's responses were the following:

#### REQUEST FOR ADMISSIONS

REQUEST 1: That attached hereto as Exhibit A is a certified copy of the policy of umbrella liability insurance, policy number UML-1996–4104–00, issued by defendant OHIC Insurance Company to Children's Health Systems, Inc., that was produced by defendant

the Fund filed a motion for declaratory judgment that OHIC's two policies for Children's cover Dr. Beauchaine, "and that OHIC's combined liability limit of $20,400,000 must be exhausted before [the Fund] has exposure for any liability of Beauchaine." The Fund

OHIC Insurance Company in response to Request No. 2 of the plaintiff's eighth request for production of documents.

**RESPONSE:** This request is admitted by defendant OHIC Insurance Company as its interests apply to Angela Beauchaine, M.D.

REQUEST 2: That this policy of umbrella liability insurance was in force and in effect from March 1, 1996, through March 1, 1997.

**RESPONSE:** This request is admitted by defendant OHIC Insurance Company as its interests apply to Angela Beauchaine, M.D.

REQUEST 3: That pursuant to General Amendatory Endorsement No. 4, the limits of liability under this umbrella policy for covered losses occurring in March of 1996 was $20,000,000.

**RESPONSE:** This request is admitted by defendant OHIC Insurance Company as its interests apply to Angela Beauchaine, M.D.

REQUEST 4: That defendant Angela Beauchaine was an insured under this umbrella liability policy at all times material to this lawsuit, including on 3/20/96 and 3/21/96.

**RESPONSE:** This request is admitted by defendant OHIC Insurance Company as its interests apply to Angela Beauchaine, M.D.

REQUEST 5: That this umbrella policy provides excess liability coverage to defendant Angela Beauchaine for any personal injuries caused by her professional negligence in March of 1996 to patients of Children's Hospital of Wisconsin, including but not limited to Sarah Hegarty.

**RESPONSE:** This request is admitted by defendant OHIC Insurance Company as its interests apply to Angela Beauchaine, M.D.

Dr. Beauchaine and Children's also responded to the above requests by admitting them.

admitted that it could be liable for Dr. Beauchaine's alleged negligence because "Beauchaine was 'conducting the business' of [Children's] while she was caring for patients there as a resident," but specified that the Fund would only "provide excess liability coverage for Beauchaine's alleged negligence over and above OHIC's policy limits." OHIC asserted that the Fund had conceded that Dr. Beauchaine was "conducting the business of" Children's. In response, the Fund sent a letter explaining that even if the motion "appears to state as fact that Beauchaine was 'conducting the business' of [Children's] while she was caring for patients there as a resident," "[t]his is not a fact conceded by [the Fund]." The letter further explained that "for [the Fund] to have any exposure for liability through the hospital, the limits of the insurance policies issued by OHIC to the hospital would first have to be exhausted."

¶ 27. In response to the Fund's motion, OHIC argued that while Beauchaine is covered by the policy, the umbrella policy does not in fact insure against medical malpractice liability. OHIC instead insisted that the Fund's motion was brought due to a mistaken assumption that the primary and the umbrella policy provided coverage for the same things, and pointed to a provision in the umbrella policy that excludes entities defined by WIS. STAT. § 655.01 as a "health care provider." Citing *Patients Compensation Fund v. Lutheran Hosp. - LaCrosse, Inc.*, 223 Wis. 2d 439, 588 N.W.2d 35 (1999), OHIC argued that, in light of the wording of the umbrella policy that health care providers are excluded, Dr. Beauchaine is not covered by the umbrella policy for medical malpractice because she was "conducting the business of" Children's. When asked by the court if the umbrella policy would ever be touched, OHIC's counsel

responded that it covers only losses resulting from incidents such as "nuclear waste," "toxic waste and property damage."

¶ 28. At this time, counsel for the Hegartys brought to the court's attention OHIC's responses to the 2000 request for admissions, which had specifically indicated that the umbrella policy covered "professional negligence."

¶ 29. The court granted the Fund's motion, concluding that it was "clear" that Dr. Beauchaine was "insured and covered for professional liability," that "there is coverage under both policies, $400,000 policy and the $20 million policy," and that the Fund's coverage "does not kick in until these two are exhausted." On July 9, 2004, OHIC filed a motion for reconsideration and requested permission to amend its response to the September 2000 request for admissions that had been the basis for the court's ruling.[13] The motions were denied by the trial court, which, applying WIS. STAT.

---

[13] OHIC requested permission to amend the response to the fifth request for admission to state:

> Objection. This request is vague and ambiguous with regard to the phrase "for injuries caused by her professional negligence." Whether coverage is provided pursuant to the excess liability policy in question can only be determined after a finding has been entered by a jury and affirmed by the court. Without waiving said objection, OHIC admits that the Umbrella Policy provides excess liability coverage to Beauchaine; however said coverage is excess to any amount the Wisconsin Patient's Compensation Fund is legally obligated to pay. If Beauchaine is found to have been conducting the business of [Children's] at the time of her alleged negligence, the Wisconsin Patient's Compensation Fund is liable as excess liability insurer for any verdict in excess of the maximum insurance provided to [Children's] ($400,000). *Patients Compensation Fund v. Lutheran Hosp.-LaCrosse, Inc.*, 223 Wis. 2d 439, 588 N.W.2d 35 (1999).

§ 804.11(2),[14] concluded that there was no reason to allow OHIC to withdraw its admissions:[15]

> I don't see any real reason here, either, for this court to allow them to change their answers to admissions. I think it's pretty late in the game to do so. It's really a discretionary act. I don't see any reason why I should apply my discretion in this particular case. There will be some prejudice. There is prejudice to the plaintiff or all parties here. They would have to do more discovery. There is prejudice to this court's process. This case should move along under it's [sic] normal progression, and anytime we try to do something like this, it may change the progression of this case. So there is prejudice, not only to the parties but prejudice to this court's process at this late date. The court will deny that request.

¶ 30. OHIC first contends that the Fund's motion for declaratory judgment should have been denied. As it did at the trial court, OHIC again relies on *Lutheran Hospital*. In *Lutheran Hospital*, the Wisconsin Supreme Court explained the function of the Fund, stating that in a successful medical malpractice case under WIS. STAT. § 655.27(1), the Fund "pays the part of the claim

---

[14] WISCONSIN STAT. § 804.11 provides in part:

> (2) EFFECT OF ADMISSION. Any matter admitted under this section is conclusively established unless the court on motion permits withdrawal or amendment of the admission. The court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice the party in maintaining the action or defense on the merits.

[15] On September 23, 2004, this court denied OHIC's petition for leave to appeal the trial court's determination not to permit the amendment to the request for admissions.

which is in excess of either the amount of primary insurance coverage required by statute or the amount of primary insurance coverage actually carried by the health care provider, whichever is greater." *Lutheran Hosp.*, 223 Wis. 2d at 452–53. Based on WIS. STAT. § 655.23(5), the court concluded that the liability of those conducting a health care provider's business is included within the limit which applies to the malpractice liability of the health care provider:

> While health care liability insurance, self-insurance or a cash or surety bond remains in force, the health care provider, the health care provider's estate, *and those conducting the health care provider's business,* including the health care provider's health care liability insurance carrier, *are liable for malpractice for no more than the limits expressed in sub. (4) or the maximum liability limit for which the health care provider is insured,* whichever is higher, if the health care provider has met the requirements of this chapter.

*Lutheran Hosp.*, 233 Wis. 2d at 457 (quoting 655.23(5); emphasis in *Lutheran Hosp.*). Recognizing that Dr. Beauchaine herself is not a "health care provider" under WIS. STAT. ch. 655 because of her status as an unlicensed first-year resident, OHIC contends that the Fund's liability "is determined based upon the liability limits applicable to Chapter 655 'health care providers.'" Because the umbrella policy reads in part: "It is agreed that no medical malpractice liability is provided hereunder for any entity which is defined by Wisconsin Statutes, Section 655.001 as a health care provider," OHIC submits that Children's is "expressly not covered by the umbrella policy because it is a Chapter 655 health care provider," and that "the maximum liability for which the health care provider ([Children's]) is insured is $400,000 and not $20,000,000." Therefore,

101

the argument goes, the "trial court inappropriately relied upon OHIC's admission that the umbrella policy 'provides excess coverage for Beauchaine' " because, under *Lutheran Hospital,* "what controls is the 'amount of coverage actually carried by the health care provider.' " Here, the health care provider is Children's, and as such, OHIC argues that it is not liable for any amounts assessed against Beauchaine and OHIC in excess of OHIC's primary policy limit of $400,000.

¶ 31. In a related argument, OHIC asserts that it should have been permitted to amend its response to the Hegartys' request for admissions. In accordance with its first argument, OHIC explains that its response to the request for admissions "has nothing to do with the legal question of [the Fund]'s obligation pursuant to the relevant statutes" because the request for admissions asked about Dr. Beauchaine's coverage under OHIC's policy, while the relevant inquiry is the amount of coverage that Children's has available to it.

¶ 32. According to OHIC, the trial court therefore erroneously denied the amendment by concluding that more discovery would be required, and that the court's process and the Hegartys would be prejudiced because it would not preclude them from maintaining their action and does not change the factual issues or the merits of the Hegartys' claims. Rather, because the request for admission was unrelated to the Fund's legal obligation, OHIC asserts that its request to amend its response was in actuality "based upon the Fund's retraction of its statements that Beauchaine was conducting the business of [Children's] at the time of her alleged negligence."

¶ 33. The Hegartys respond that the trial court properly denied OHIC's attempt to withdraw its pretrial admission because the court articulated a rational

basis for its decision and there was overwhelming support for it in the record, calling it a belated attempt to shift payment responsibility for Dr. Beauchaine's negligence onto the Fund.

¶ 34. The Hegartys submit that OHIC has failed to make a minimal showing of how the merits of this case would have been served by an amended admission, arguing that it "would have had a devastating impact on the resolution of the case" because the parties relied on the admission, and thus, if coverage had become an issue, more discovery would indeed have been required, insufficient time existed to complete discovery before trial, and an adjournment would have been necessary.

¶ 35. The Hegartys also maintain that the trial court correctly determined that OHIC's primary and umbrella policies provide $20,400,000 in coverage for Dr. Beauchaine's liability, because the issue "turns on the interpretation of OHIC's policy terms, not on who is vicariously liable for her professional negligence." According to the Hegartys, since Dr. Beauchaine is an insured under the umbrella policy, and because, as a first-year resident, she does not fall under the exclusions applicable to Wis. Stat. ch. 655, the umbrella policy applies.

¶ 36. We begin by addressing OHIC's contention that its motion to amend its response to the request to admit should have been granted.

¶ 37. The trial court's decision whether to allow withdrawal of an admission is reviewed under the erroneous exercise of discretion standard. *See Schmid v. Olsen*, 111 Wis. 2d 228, 237, 330 N.W.2d 547 (1983). We will uphold a trial court's discretionary act if the court examined the relevant facts, applied a proper

standard of law, and, demonstrating a rational process, reached a conclusion that a reasonable judge could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982).

¶ 38. When a party responds to a request for an admission by admitting a matter, the admission conclusively establishes the issue, unless the court permits withdrawal. Wis. Stat. § 804.11(2). A court's authority to permit withdrawal is constrained as follows:

> The court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice the party in maintaining the action or defense on the merits.

*Id.* "Thus, the statute provides that a court 'may' permit withdrawal or amendment only if 'the merits of the action will be subserved' and if the party who benefits from the admission 'fails to satisfy the court that withdrawal . . . will prejudice' the benefiting party." *Mucek v. Nationwide Commc'ns, Inc.*, 2002 WI App 60, 26, 252 Wis. 2d 426, 643 N.W.2d 98.

¶ 39. OHIC's responses to the request for admissions in 2000 unequivocally admitted that Dr. Beauchaine was covered by OHIC's primary policy with a limit of $400,000, as well as the umbrella policy with a limit of $20 million, for "professional negligence." For four years OHIC made no efforts to amend or retract this admission. When the Fund sought a declaratory judgment, OHIC argued, for the first time, contrary to its admission, that the umbrella policy does not in fact insure Dr. Beauchaine against medical malpractice. We

104

cannot agree with OHIC's claim that allowing an amendment would not have required further discovery, or caused delay, and would not have prejudiced the Hegartys. The Hegartys rightfully relied on the admission for four years, and, operating under the assumption that OHIC's coverage was not an issue, conducted no discovery on the issue.

¶ 40. OHIC insists, however, that the Hegartys would be unaffected by this amendment because the issue was between it and the Fund. We disagree. If the amendment would have been allowed, in the words of the trial court, "this late in the game," thereby making OHIC's coverage an issue, logically a substantial amount of new discovery would have been required, causing additional delays in an already very long process. The Hegartys, the numerous other parties involved, and, as the trial court recognized, the judicial process itself, would have been prejudiced. OHIC has not convinced us that the trial court erroneously exercised its discretion in refusing to allow OHIC to amend its admission.

¶ 41. Moreover, we cannot agree that OHIC's claim that its request to amend "was based upon the Fund's retraction of its statements that Beauchaine was conducting the business of [Children's]." The admission was made four years before the alleged "retraction," and within a few days the Fund's letter explained the meaning of the contested statement; consequently, a claim by OHIC that it became necessary to change its admission from 2000 based on a statement made (and immediately thereafter explained) in 2004 is not convincing. By this logic, if, as OHIC says, the request to amend was in fact made *only* in response to the Fund's alleged retraction, and the "request to admit has nothing to do with [the Fund]'s legal obligation," one won-

ders why OHIC even sought to amend the admission and why on appeal the argument is presented in the same section as their contention that the trial court erroneously granted the Fund's motion for declaratory judgment. OHIC's reply brief sheds some light on what OHIC is in fact arguing, asserting that the requested amendment "clarifies OHIC's position regarding the interplay between its umbrella policy, the language in ch. 655 and the case law to determine the Fund['s] liability in this case," and "addresses which party will ultimately be responsible for the payment of any judgment against Beauchaine (the Fund or OHIC)." OHIC had the opportunity to "clarify its position" regarding the umbrella policy for years before the Fund's motion, yet OHIC failed to do so. OHIC has failed to convince us that the trial court erred in refusing to permit it to amend a four-year-old response to a request for admissions.

¶ 42. Beyond the issue of the amendment, OHIC also claims that even if the court correctly denied its request to amend, it still erred in relying on that admission in ruling on the Fund's declaratory judgment motion. OHIC's reply brief in particular explains that its argument is not that Dr. Beauchaine is not covered by the umbrella policy, but rather, that the umbrella policy is not triggered, and that the court erred in granting the Fund's motion declaring that OHIC's combined liability limits of $20,400,000 must be exhausted before the Fund has exposure. We disagree with OHIC's contention that although Dr. Beauchaine is covered by the umbrella policy, it would be triggered only after the Fund's limits are met, and that because the Fund's coverage is unlimited, the umbrella policy is not triggered.

106

■

¶ 43. This issue turns on the wording of the policy itself, not on whether Children's is liable for Dr. Beauchaine's negligence. An examination of the umbrella policy makes this plain. The umbrella policy, whose named insured is Children's, provides that the insured includes "any other person or organization who is an insured under any policy of underlying insurance." It is undisputed that Dr. Beauchaine is an insured under the primary policy, and she would also be an insured under the umbrella policy. As OHIC notes, the umbrella policy specifically excludes Wis. Stat. ch. 655 health care providers. However, it is undisputed that because Dr. Beauchaine was a first-year resident, she was not a licensed health care provider under chapter 655. It follows that, pursuant to the primary policy, Dr. Beauchaine was independently insured under the umbrella policy, and that she was not insured under it only subject to vicarious liability by Children's.

■

¶ 44. The coverage that the umbrella policy provides is: "To indemnify the insured for ultimate net loss in excess of the retained limit which the insured shall become legally obligated to pay as damages because of personal injury, property damage or advertising liability to which this policy applies, caused by an occurrence." As is now clear, OHIC's 2000 admission made clear that the coverage included damages resulting from "professional negligence." The plain language of the coverage description indicates that the umbrella policy is intended to cover any liability the insured is obligated to pay in damages that is in excess of the limits of the primary policy. We cannot agree with OHIC that there is an additional requirement that the Fund

must pay first before the umbrella policy is triggered.[16] OHIC has not pointed to anything to suggest that the umbrella policy was intended to be tapped only after the Fund paid. We see nothing wrong with the trial court's reliance on that admission in ruling on the Fund's declaratory judgment motion.

¶ 45. Moreover, OHIC's heavy reliance on *Lutheran Hospital*, and claim that Dr. Beauchaine must be found to have been "conducting the business of" Children's, does not change our conclusion.[17] As ex-

---

[16] In their response, the Hegartys argued that "OHIC 'did an about face' arguing for the first time in opposition to the Fund's declaratory judgment motion that its umbrella policy does not insure resident physicians against medical malpractice liability." OHIC's reply brief attacks this language by claiming that "OHIC has never argued that its umbrella policy does not cover Beauchaine" and has merely "consistently argued that its umbrella policy is not triggered."

In opposing the Fund's motion, OHIC argued that "[u]nder the umbrella policy by its very terms Children's didn't insure themselves for medical malpractice liability," claiming instead that the umbrella policy was triggered only by such things as toxic waste, nuclear waste and property damage. On appeal, apparently having abandoned the theory that toxic or nuclear waste or the like was required for the umbrella policy to come into play, OHIC apparently admits that professional negligence, including medical malpractice is included, but now attempts to distance itself from its admission by seeking to shift the responsibility to the Fund by claiming that it must pay first. This shift does not change the fact that OHIC certainly did argue that Dr. Beauchaine was not covered by the umbrella policy for medical malpractice, precisely what the Hegartys asserted, and it is disingenuous for OHIC to now claim that it "never" did so.

[17] The Hegartys further contend that OHIC's focus on whether the umbrella policy provides coverage for Children's is irrelevant because the Fund requested a ruling that OHIC's

plained, Dr. Beauchaine was independently insured under the umbrella policy, and we agree with the Hegartys that there is nothing that requires a finding that Dr. Beauchaine must be found to have been "conducting the business of" Children's before a ruling on coverage is made.[18] Even so, the issue in *Lutheran Hospital* was whether the Fund, after collecting $400,000 from the hospital where the nurse in question worked, could subrogate the nurse. *Id.*, 223 Wis. 2d 439, ¶ 15. The supreme court held that in a subrogation situation there is one limit available, the $400,000, and that the Fund does not have a right to subrogate against its own insured; that is, the nurse. *Id.*, ¶¶ 20, 45. Because OHIC has failed to make the threshold showing that the trial court erred in relying on OHIC's four-year-old admission, we see no need to further

---

limits of $20,400,000 be exhausted before the Fund has liability for Dr. Beauchaine, not Children's, and there is no dispute that OHIC's umbrella policy contains an exclusion for health care providers like Children's who receive excess coverage from the Fund. The Hegartys also point out that *Lutheran Hospital* involved a nurse, an employee of the hospital, a WIS. STAT. ch. 655 health care provider, who was entitled to coverage by the Fund, whereas Dr. Beauchaine is not a WIS. STAT. ch. 655 health care provider, nor an employee of a health care provider, and does not have Fund coverage. The Hegartys thus suggest that "the recognized absence of [Fund] coverage for first-year residents is precisely why a $20,000,000 umbrella policy was pronounced to provide coverage for such residents." We decline to address the reason for the existence of the umbrella policy because such a determination is not necessary to our conclusion that Dr. Beauchaine is covered for medical malpractice liability.

[18] The trial court also specifically determined that there was insufficient evidence to submit a "conducting the business of" theory to the jury and would confuse the jury. This issue will be further discussed in section A.2.b.ii of this opinion.

address OHIC's creative argument based on *Lutheran Hospital* and the "conducting the business of" language of Wis. Stat. § 655.23(5). The admission is dispositive. Additionally, the Fund is not a party to this appeal. Had OHIC wished to resurrect its argument that the Fund is liable once its $400,000 primary policy was exhausted, it should have taken steps to make the Fund a party.

*2. Special Verdict Form*

■■■■■

¶ 46. A special verdict must cover all material issues of ultimate fact. Wis. Stat. Rule 805.12(1). The form of the special verdict questions is within the discretion of the trial court. *Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 445–46, 280 N.W.2d 156 (1979). A trial court has wide discretion in framing the special verdict. *Maci v. State Farm Fire Cas. Co.*, 105 Wis. 2d 710, 719, 314 N.W.2d 914 (Ct. App. 1981), *overruled on other grounds by Rockweit v. Senecal*, 197 Wis. 2d 409, 541 N.W.2d 742 (1995), and determining what jury instructions to give, *Anderson v. Alfa-Laval Agri, Inc.*, 209 Wis. 2d 337, 344, 564 N.W.2d 788 (Ct. App. 1997). However, both the special verdict form and the jury instructions must fully and fairly inform the jury regarding the applicable principles of law. *See Maci*, 105 Wis. 2d at 719; *Anderson*, 209 Wis. 2d at 345. "In drafting a special verdict the trial court must first consider the issues raised by the pleadings. [The court] should then eliminate from the issues so raised those that are determined by the evidence on the trial by admissions, *by uncontradicted proof, or by failure of proof.*" *Lagerstrom v. Myrtle Werth Hosp.-Mayo Health Sys.*, 2005 WI 124, ¶ 97, 285 Wis. 2d 1, 700 N.W.2d 201 (citations omitted; emphasis and alterations by *Lagerstrom*). Our review of whether a jury instruction is

appropriate under the facts of a given case is *de novo*. *Schwigel v. Kohlmann*, 2005 WI App 44, ¶ 9, 280 Wis. 2d 193, 694 N.W.2d 467.

¶ 47. OHIC makes three arguments for why the trial court erred in the way it formulated the special verdict form. We address each in turn.

> *a. Jury Instruction to Answer Damage Question Only if One or More of Cause Questions Answered "Yes"*

¶ 48. First, OHIC contends that the trial court erred when it included on the special verdict form an instruction to the jury to answer the questions on damages only if it answered "yes" to one or more of the preceding questions on cause.

¶ 49. On October 11, 2004, OHIC proposed a special verdict form that contained the following instruction regarding the damage question:

ANSWER THE FOLLOWING QUESTIONS ONLY IF YOU HAVE ANSWERED "YES" TO ANY OF THE QUESTIONS ABOVE RELATED TO THE CAUSE OF INJURY, SUCH AS QUESTIONS 2, 4, 6, 8, 10, 12, 14, 18, 22, 24, 26, 28, 20, and 32.

¶ 50. The Hegartys proposed a special verdict that would give the jury the same instruction as the one proposed by OHIC. During the special verdict and jury instruction conference, the court handed the attorneys copies of the special verdict form that included the standard instruction that the jury was to answer the questions regarding damages, regardless of how it had answered the previous questions. Consistent with the parties' proposed special verdicts, the Hegartys objected to the instruction and suggested that the jury be

instructed to answer the damage questions only if it answered "yes" to one or more of the cause questions, in accordance with *Runjo v. St. Paul Fire Marine Insurance Co.*, 197 Wis. 2d 594, 602, 541 N.W.2d 173 (Ct. App. 1995), and in order to avoid an inconsistent verdict. OHIC raised a number of issues, not including the above instruction, at the conference. A recess was taken, and after the recess, the court treated the parties' agreement on the instruction as a stipulation, and having reviewed *Runjo*, the court changed the instruction in accordance with the Hegartys' suggestion. At this time, OHIC objected to the instruction. By this time, the court had prepared the printed version of the special verdict form and declined to change the instruction, noting that the parties had stipulated to the instruction and that OHIC's objection was belated.

¶ 51. OHIC contends that a special verdict and jury instruction asking the jury to assess damages, regardless of its determination as to negligence or causation, should have been used because it is proper and represents standard procedure. OHIC maintains that instructing the jury that it was to answer the question about damages only if it had affirmatively answered the question about cause was "in essence instruct[ing] the jury as to the effects of its verdict," which is explicitly prohibited by the supreme court's holding in *McGowan v. Story*, 70 Wis. 2d 189, 196, 234 N.W.2d 325 (1975). OHIC thus contends that because the trial court erred in making the modification requested by the Hegartys, over its objection, it is entitled to a new trial.

¶ 52. The Hegartys contend that OHIC cannot claim error because it requested the very language in its own proposed special verdict form that it now challenges as improper, and that OHIC's claim that it

112

objected is false because it stipulated to the instruction, did not object during the jury instruction and special verdict conference, even though it raised a number of other issues, and waited until the jury was about to be instructed to raise an objection and has thus waived any claimed error.

¶ 53. Addressing the merits of OHIC's argument, the Hegartys respond that not only is the instruction the court gave not erroneous under *Chopin v. Badger Paper Co.*, 83 Wis. 192, 53 N.W. 452 (1892), and *Banderob v. Wisconsin Central Railway Co.*, 133 Wis. 249, 113 N.W. 738 (1907), but it also was appropriate in this case because in medical malpractice cases, allowing the jury to award damages regardless of how it answered negligence and cause questions can lead to inconsistent verdicts under *Runjo*, 197 Wis. 2d 594, and *LaCombe v. Aurora Medical Group, Inc.*, 2004 WI App 119, ¶ 5, 274 Wis. 2d 771, 683 N.W.2d 532.

¶ 54. We begin by addressing the Hegartys' claim that OHIC has waived the argument. A failure to object at the jury instruction or verdict conference stage "constitutes a waiver of any error in the proposed instructions or verdict." WIS. STAT. § 805.13(3); *see Gosse v. Navistar Int'l Transp. Corp.*, 2000 WI App 8, ¶ 9, 232 Wis. 2d 163, 605 N.W.2d 896.

¶ 55. At one point, OHIC clearly endorsed the idea of instructing the jury to answer damage questions only if it had answered "yes" to one or more cause questions, as evidenced by the fact that OHIC's proposed special verdict form contained the same phrase that it is now challenging. In fact, OHIC did not object to the instruction during the jury instruction and special verdict conference when the Hegartys proposed it after the court had included the standard instruction

on the form, even though it did raise a number of other issues, and instead waited until the court was about to give the jury the instruction to raise the objection. While OHIC claims it objected to the instruction, its objection was certainly belated. Although the Hegartys claim OHIC never objected and stipulated to the instruction, OHIC did indicate to the court at the time of its eventual objection that it had not stipulated. Because, despite initially proposing the instruction, OHIC did object to it when the court announced the modification, and because it appears unclear whether there was a stipulation, we decline to consider the objection waived and reach the merits of OHIC's argument.

¶ 56. We disagree with OHIC. As the Hegartys point out, our supreme court has held that it is not error to instruct the jury to answer questions on damages only if the jury affirmatively answered questions on causation. *See Chopin*, 83 Wis. 192; *Banderob*, 133 Wis. 249. Thus, even though the usual practice is to instruct juries to answer questions about damages regardless of how they answered the questions of cause, it was not error to frame the special verdict in the fashion the court did in this case. We further agree with the Hegartys that, given that this is a medical malpractice case, deviation from the standard practice was proper because the jury was also instructed to award damages *only* for injuries sustained as a result of the care and treatment rendered by the alleged wrongdoer. Thus, to ask the jury to award damages regardless of whether it found the care to be negligent, would have been inconsistent with the other jury instructions and could have led to an inconsistent verdict, had the jury not found negligence but nonetheless gone on to award damages.

¶ 57. This was the case in *Runjo*, a medical malpractice informed consent case, where the plaintiffs' request for a special verdict directing the jury to answer the damage questions only if it answered any of the cause questions "yes" was denied, and the jury found no breach of the duty of informed consent but did award damages. *Id.*, 197 Wis. 2d at 597–98. On appeal, this court concluded that the inconsistent instructions had allowed the jury to answer "no" and "yes" to the same question, and granted a new trial. *Id.* at 604–05.

¶ 58. In *LaCombe*, a medical malpractice case, the jury found negligence, answered the cause question "no," yet awarded damages. *Id.*, 274 Wis. 2d 771, ¶ 3. There, by contrast, this court denied a motion for a new trial because the plaintiff had not requested a jury instruction that the jury answer the damage question only if it answered the causation and negligence questions "yes." *Id.*, ¶ 11. We concluded that "LaCombe could have requested that the trial court direct the jury to answer the damages questions only after affirmatively answering the negligence and causation question, but he chose not to do so." *Id.*

¶ 59. In its reply brief, OHIC seeks to distinguish *Runjo* and *LaCombe*, insisting that the issue is governed by *McGowan*, which postdates *Chopin* and *Banderob*, and stands for the proposition that juries may not be instructed on the effect of the verdict. *McGowan*, 70 Wis. 2d at 196. OHIC claims in particular that *Runjo* is inapplicable because the case involved a claim of informed consent. We disagree with this distinction. The fact that the case involved informed consent does not change the crux of the holding that the instructions were inconsistent, and this inconsistency was the reason the court granted a new trial. *See Runjo*, 197 Wis. 2d at 604–05. In fact, in *Runjo* the court specifically

rejected the defendants' argument that the instructions were proper because they were based on the standard instruction. *See id.* at 604. OHIC's reply also attacks the Hegartys' reliance on *LaCombe* by claiming, in reference to the instruction to answer the damage question regardless of how the jury answered the negligence question, that "[a]t no time did the court find such language improper." This claim is misleading. The issue in *LaCombe* was whether the plaintiff had waived the issue under Wis. Stat. § 805.13(3) by failing to object to it at the jury instruction conference. *Id.*, 274 Wis. 2d 771, ¶ 5. Finding that "LaCombe's claim of error would have been evidence at the jury instruction and special verdict conference," the court concluded that the claim was waived. *Id.*, ¶ 11. In contrast to what OHIC would have us believe, the court never reached the merits of the case. Moreover, while complaining about the age of *Chopin* and *Banderob*, OHIC has made no effort to show that they are no longer good law.

¶ 60. We thus agree with the Hegartys that *Runjo* recognizes the problem of the potential for inconsistent verdicts resulting from inconsistent instructions, and makes clear that it is within the trial court's discretion to instruct the jury to answer the damage questions only if it affirmatively answered the negligence and cause questions, and *LaCombe* adds that a request for such an instruction must be made prior to post-verdict motions. We are convinced that the trial court was well within its discretion to instruct the jury in the manner it did.

### b. Dr. Beauchaine's Employment Status

¶ 61. In *Hegarty I*, this Court concluded that a trial was required to resolve whether Dr. Beauchaine was a servant of MCWAH and whether Dr. Beauchaine

116

was a borrowed employee, because "someone" had to be Dr. Beauchaine's employer. *Id.*, 249 Wis. 2d 142, ¶ 2, 57–78. Following remand, the trial court noted that the issue of whether Dr. Beauchaine was a loaned or borrowed employee "may have been a question of fact at that point of the level of the appeal, but it may not be at this level."

¶ 62. As already discussed, on April 14, 2004, the Fund filed a motion for declaratory judgment that OHIC's two policies for Children's cover Dr. Beauchaine, and that OHIC's combined liability limit of $20,400,000 must be exhausted before the Fund has exposure for any liability of Dr. Beauchaine, a motion the trial court ultimately granted. During the briefing on this motion, an issue arose as to whether Dr. Beauchaine was "conducting the business of" Children's as that term is defined in Wis. Stat. § 655.23(5).[19] In ruling on the motion, the trial court stated that a question of fact existed as to whether Dr. Beauchaine was "conducting the business of" Children's on March 20–21, 1996, and that this question was to be included on the special verdict form.

¶ 63. At the close of evidence, Children's moved for dismissal on grounds that there was nothing in the record to keep it in the case. OHIC admitted that it was unable "to point to any evidence in opposition to

---

[19] Wisconsin Stat. § 655.23(5) provides:

While health care liability insurance, self-insurance or a cash or surety bond under sub. (3)(d) remains in force, the health care provider, the health care provider's estate and those conducting the health care provider's business, including the health care provider's health care liability insurance carrier, are liable for malpractice for no more than the limits expressed in sub. (4) or the maximum liability limit for which the health care provider is insured, whichever is higher, if the health care provider has met the requirements of this chapter.

[Children's] motion." In light of a "different record" before it, the court granted the motion, and announced:

> There is no direct evidence to show that Children's Hospital was active in any way in regards to the treatment of Sarah Hegarty. There is absolutely no evidence as to Children's Hospital being actively involved or directly or indirectly involved in any malpractice here either as a master/servant or any theory that would come up.[20]

(Footnote added.)

¶ 64. OHIC then requested that the special verdict form include a question as to whether Dr. Beauchaine was "conducting the business of" Children's, the Medical College or both. OHIC argued that the Medical College should be on the special verdict form as vicariously liable for Dr. Beauchaine, that is, the jury should be asked whether Dr. Beauchaine was "conducting the business of" the Medical College. The Hegartys responded, and OHIC eventually agreed, that there was no evidence that the Medical College was vicariously liable for Dr. Beauchaine, and OHIC instead changed its argument to insisting that the Medical College should be on the verdict under the theory of negligent supervision. Given the agreement among the parties that there was

---

[20] Immediately after Children's dismissal from the case, it was argued by counsel for Children's that for the same reason Children's was dismissed, MCWAH should also be dismissed. Dr. Beauchaine opposed the motion. The court agreed and dismissed MCWAH from the case, concluding that it saw "nothing in this record to indicate that MCWAH had any control over the treatment of Sarah Hegarty by Dr. Beauchaine or any other doctor," and added that "[t]hey are an umbrella organization that is used to facilitate this process of residents teaching through [the Medical College]."

no evidence suggesting that the Medical College was vicariously liable for Dr. Beauchaine, the court ruled that no such question would be on the verdict. After the court made its ruling, OHIC requested that the trial court include questions as to whether Dr. Beauchaine was a loaned or borrowed employee at the Medical College and whether Dr. Beauchaine was "conducting the business of" Children's or the Medical College.

¶ 65. The court refused to include such questions on grounds that it had already ruled on the issue and concluded that there was no evidence to support such findings: "I already ruled on Children's Hospital, and I just ruled on [the Medical College]." In its motions after verdict, OHIC argued that the trial court had erred in not including the "conducting the business of" question, and in the alternative, requested that the court declare, as a matter of law, that Dr. Beauchaine was "conducting the business of" a health care provider.

### i. Loaned or Borrowed Employee

¶ 66. OHIC first contends that the trial court erred in failing to submit to the jury a question inquiring as to whether Dr. Beauchaine was a loaned or borrowed employee, and in failing to resolve the issue as a matter of law.

¶ 67. OHIC points to several facts about Dr. Beauchaine's status as a resident in an effort to argue that she was a loaned or borrowed employee, including: the fact that Dr. Beauchaine was an unlicensed first-year medical resident, unable to practice medicine outside a training program; that while she had an employment contract with MCWAH, MCWAH performed only bookkeeping functions, and the Medical College hired and placed residents; the Medical

College's training program director was in charge of schedules, rotations and evaluations for the residents; residents were supervised by attending physicians who serve on the Medical College faculty; and Children's provides residents all the necessary equipment and instruments, and in return the residents are required to comply with the administrative and professional policies, procedures, rules and regulations of MCWAH, the Medical College and Children's.

¶ 68. On this basis, OHIC asserts that, "[a]s a loaned or borrowed employee of [Children's] and/or the Medical College, which are both inarguably 'health care providers' under Chapter 655, *see* § 655.002(1)(h), Stats., Beauchaine was an employee entitled to the protection of the statutory economic caps as a matter of law." OHIC cites *Borneman v. Corwyn Transport, Ltd.*, 219 Wis. 2d 346, 580 N.W.2d 253 (1998), for the test for when an employee is borrowed:

> The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

> The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?

*Id.* at 353–54 (citation omitted). OHIC argues as follows:

> First, Beauchaine consented to work for [Children's] and/or [the Medical College] by virtue of her enrollment in the Pediatric Residency Program and the fact that [the Medical College] is responsible for placing residents at member institutions such as [Children's]. Second, Beauchaine was performing work for [Children's] and/or [the Medical College] at the time of the injury; namely, as part of her medical training at [the Medical College], she was treating and caring for patients at [Children's]. Third, [Children's] and/or [the Medical College] had the right to control the details of the work being performed: Beauchaine was required to comply with the policies and procedures of [the Medical College] and [Children's]; she was supervised by the attending physicians of [Children's]; and she was trained by [the Medical College] personnel. Finally, Beauchaine's work was being done primarily for the benefit of [Children's] and/or [the Medical College] – not MCWAH – as evidenced by the fact that [Children's] reimbursed MCWAH for all costs.

¶ 69. After explaining at length why *Borneman* "compels a finding that Beauchaine was a borrowed employee of [Children's] and/or [the Medical College]," OHIC concludes that, "No logical reason exists for the trial court fiat declaring Beauchaine's employment status a non-issue. The transparent purpose of that ruling was to create an uncapped defendant." In light of this analysis, OHIC asks this court to find, as a matter of law, that Dr. Beauchaine was a loaned employee of Children's and/or the Medical College, or, alternatively, grant a new trial, asserting that had Children's and/or the Medical College been included on the special verdict form as Dr. Beauchaine's employers, the jury's findings as to liability and appointment would have been different.

121

¶ 70. The Hegartys dismiss OHIC's argument by insisting that it is "nothing but an attempt to get around its binding pre-trial admissions that WIS. STAT. ch. 655 does not apply to Beauchaine and that its umbrella liability policy applies to Beauchaine." They assert that OHIC has impermissibly changed its position numerous times on whether WIS. STAT. ch. 655 applies to Dr. Beauchaine: in 1999, OHIC moved for summary judgment, arguing that, as a first-year resident, Dr. Beauchaine was "not subject to chapter 655"; next, OHIC moved for a declaratory judgment, arguing that WIS. STAT. § 893.55(4) is independent from ch. 655, and Dr. Beauchaine is entitled to the cap "regardless of her employment status or relationship to Children's"; and finally, following our decision in *Phelps*, *see id.*, 273 Wis. 2d 667, OHIC argued that Dr. Beauchaine was covered under ch. 655 by virtue of her employment status and relationship to Children's and/or the Medical College. The Hegartys emphasize that prior to *Hegarty I*, they were the only party to raise the issue of vicarious liability, and that no defendant raised the borrowed/loaned employee doctrine as an affirmative defense. They also assert that even on the merits, no party produced sufficient evidence at trial to properly support the inclusion of any borrowed/loaned employee questions on the special verdict, and that, as such, OHIC is unable to satisfy the *Borneman* standard, concluding that "even now OHIC is still not sure who was the alleged 'borrowing' employer of Beauchaine."

¶ 71. We disagree with OHIC. In *Phelps*, the supreme court affirmed this court's holding that a first-year medical resident is not a health care provider within the meaning of WIS. STAT. ch. 655 and is therefore not subject to the caps of WIS. STAT. § 893.55(4).

*Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2005 WI 85, ¶ 64, 282 Wis. 2d 69, 698 N.W.2d 643. The court did indicate, however, that in certain situations, as in the one in *Phelps* itself, an issue may exist as to whether a physician is either a loaned or borrowed employee. *Id.*, ¶ 65.

¶ 72. As the Hegartys note, there was no evidence supporting the contention that Dr. Beauchaine was a loaned or borrowed employee. In fact, OHIC never advanced the theory of a loaned or borrowed employee during trial – apparently it lay dormant after remand until it was mentioned by counsel at the jury instruction special verdict conference.

¶ 73. Even so, under *Borneman*, the analysis must start with the presumption that an employee is not loaned or borrowed. *Id.*, 219 Wis. 2d at 357. The *Borneman* test makes clear that the crucial elements are the consent of the employee to be borrowed and the control of the borrowing employer. *Id.* at 356–58. OHIC points to facts that suggest that there was an interplay between the Medical College, Children's and MCWAH, but none of it informs us about the crucial questions of consent and control, and the cited facts do not even come close to rebutting the presumption that Dr. Beauchaine was not a loaned or borrowed employee.

¶ 74. In pretrial admissions, dated December 14, 1999, Dr. Beauchaine provided the following admissions and denials, vis-à–vis her status and care of Sarah on March 20–21, 1996:

- admitted, without qualification, that MCWAH was her employer on March 21, 1996

- denied that Children's "had the right to control or supervise the health care services provided" by her at Children's to Sarah

- denied that the Medical College "had the right to control or supervise the health care services provided" by her at Children's to Sarah

- denied that Children's was her "*de facto* employer"

- denied that Children's was "legally responsible for the health care services" she provided to Sarah

- denied that the Medical College was "legally responsible for the health care services" she provided to Sarah

¶ 75. In response to the same inquiries, also dated December 14, 1999, Children's responded, subject to a vagueness objection, as follows:

- denied it "had the right to control and supervise the health care services" provided by Dr. Beauchaine to Sarah at Children's

- denied that is was the "*de facto* employer" of Dr. Beauchaine on March 21, 1996

- denied that it was "legally responsible for the health care services" Dr. Beauchaine provided to patients of Children's, including Sarah

These admissions unequivocally establish that Children's was never Beauchaine's employer and did not "borrow" her.[21]

---

[21] Moreover, we note, as is clear from OHIC's claim that "[a]s a loaned or borrowed employee of [Children's] and/or [the Medical College], which are both inarguably 'health care providers' under Chapter 655, *see* § 655.002(1)(h), Stats., Beauchaine was an employee entitled to the protection of the statutory economic caps as a matter of law," what OHIC is arguing is in reality not that Dr. Beauchaine's employment status was that of a loaned or borrowed employee, but rather,

## ii. *"Conducting the Business of" Question*

¶ 76. Second, OHIC contends that the trial court erred in refusing to include a special verdict question inquiring as to whether Dr. Beauchaine was "conducting the business of" a health care provider.

¶ 77. OHIC argues that the failure to include the question was erroneous because there was sufficient evidence to have the jury decide the issue. OHIC refers to the testimony by Sarah's mother, Mrs. Hegarty, that Sarah went to Children's to receive treatment, and that it was her understanding that Dr. Beauchaine was the person at Children's who was going to provide that treatment. OHIC also refers to the testimony of Dr. Hagen, that as a medical resident assigned to Children's, she was conducting the business of Children's, and that treating children with medical problems was the business of Children's. OHIC further refers to the excluded deposition testimony of Dr. Lewis and makes an argument based on what the deposition would have shown.[22]

---

that Dr. Beauchaine should be subject to the statutory economic caps. This is also obvious from OHIC's accusation that the trial court's "transparent purpose" for its ruling was "to create an uncapped defendant." We decline to comment on OHIC's harsh comments about the trial court's ruling beyond pointing out that the most "transparent" aspect appears to have been OHIC's attempt to subject Dr. Beauchaine to the statutory caps via a belated attempt to argue that she was a loaned or borrowed employee.

[22] OHIC asserts that the deposition testimony of Dr. Lewis was erroneously excluded as irrelevant and would have informed the jury that "while residents were paid by MCWAH, such payments were reimbursed by the participating hospitals," that "it was [Children's] procedures and practices that governed Beauchaine's handling of Sarah's case, and that as part of her

¶ 78. In addition, OHIC also maintains that the residents working for Children's were under the supervision of the Medical College, and that therefore, the

> clear and uncontroverted evidence in the case was that [the Medical College] was responsible for and had control over any reviews of the residents working in the hospital, and that the residents' day-to-day assignments and supervision were overseen and controlled by [the Medical College] through a pediatric faculty member.

¶ 79. OHIC insists that "[t]here was never any dispute in this case that [the Medical College], [Children's] and Zimmer qualify as 'health care providers' as that term is defined in Chapter 655," and that "[t]hus, while there may be some dispute as to which health care provider ([Children's], [the Medical College], or Zimmer), Beauchaine was 'conducting the business of,' there can be no dispute that she was conducting the business of one of them under 655.23(5), Stats."[23]

---

employment agreement, Beauchaine was required to comply with all administrative and professional policies, procedures, rules, and regulations of [Children's]." The issue of the exclusion of Dr. Lewis's testimony will be addressed in section B.3.c.i of this opinion and will thus not be examined here.

[23] In the alternative, OHIC again asks this court to rule as a matter of law that Dr. Beauchaine was conducting the business of the Medical College, Children's, or Zimmer on March 20–21, 1996. OHIC asserts that "the undisputed evidence is that Beauchaine was in fact conducting the business of all three health care providers in this case," claiming that under *Patients Compensation Fund v. Lutheran Hospital-La Crosse, Inc.*, 216 Wis. 2d 49, 57, 573 N.W.2d 572 (Ct. App. 1997), "[t]he fact that Beauchaine did not have a formal employment agreement with either [the Medical College], [Children's], or Zimmer does not preclude this Court from making such a finding in this

¶ 80. The Hegartys respond that the "conducting the business of" question is no different from vicarious liability, and point out that OHIC cites no authority for why there is a difference between the two inquiries or for what it means to "conduct the business of" a health care provider. They contend that because at trial, even counsel for OHIC had difficulty trying to articulate exactly what a "conducting the business of" inquiry was, the jury could not have been expected to answer such a question. Finally, referring to OHIC's claim that Dr. Beauchaine was conducting the business of Children's, the Medical College, or Dr. Zimmer, the Hegartys also note that OHIC had the burden to prove whose business Dr. Beauchaine was conducting, and therefore, because OHIC was unable to do so, maintain that the court did not err.

¶ 81. We again disagree with OHIC. OHIC has not shown how a "conducting the business of" inquiry is different from an inquiry about vicarious liability. By the time OHIC sought to have a "conducting the business of" question added, the court had already ruled-based on the Hegartys' argument and OHIC's agreement with that argument that the Medical College was not vicariously liable for Dr. Beauchaine. Likewise, Children's had already been dismissed from the case for the same reason. So when the trial court declined to further address OHIC's "conducting the business of" issue on grounds that it had already addressed it, it clearly did so because it properly equated the "conducting the business of" question with vicarious liability.

case." Because we reject OHIC's argument that the trial court erred in refusing to include a "conducting the business of" question on the special verdict, we do not address this argument.

¶ 82. Further, we also agree with the Hegartys that since even counsel for OHIC appears to have had difficulties explaining what exactly "conducting the business is" meant, it would be unreasonable to expect the jury to comprehend it. Likewise, as is clear from OHIC's brief, even OHIC does not know whose business Dr. Beauchaine was allegedly conducting: "[W]hile there may be some dispute as to which health care provider ([Children's], [the Medical College], or Zimmer) Beauchaine was 'conducting the business of,' there can be no dispute that she was conducting the business of one of them." OHIC has the burden to identify whose business Dr. Beauchaine was supposed to have been conducting, but was unable to do so, with any more specificity than stating that she must have been conducting someone's business. This is simply insufficient.[24] The trial court did not err in refusing to include a "conducting the business of" question on the special verdict, having established that there was no evidence of vicarious liability.

### 3. Counsel for OHIC Denied Right to Participate at Time of Trial

¶ 83. OHIC contends that counsel for OHIC should not have been denied the right to participate at the time of trial.

---

[24] In actuality, what OHIC's argument appears to come down to is that someone else should be liable for her: "[W]hile there may be some dispute as to which health care provider ([Children's], [the Medical College], or Zimmer) Beauchaine was 'conducting the business of,' there can be no dispute that she was conducting the business of one of them under 655.23(5), Stats." As that sentence makes clear, and as was the case with the loaned or borrowed employee issue, this argument is little more than a backdoor attempt to fit Dr. Beauchaine under Wis. Stat. ch. 655.

¶ 84. During the proceedings, OHIC had two attorneys: first, Paul Grimstad, representing Dr. Beauchaine and OHIC, as OHIC's interests related to Dr. Beauchaine; and second, Todd Weir, representing Children's and OHIC, as OHIC's interests related to Children's. A few months before trial, OHIC hired a third attorney, Emile Banks, to represent OHIC's interests as they related to Children's. On May 3, 2004, Weir moved to withdraw as counsel for OHIC, as its interests related to Children's, because OHIC had hired Banks. The court granted Weir's motion and ordered Banks to serve as counsel for OHIC, as its interests related to Children's.

¶ 85. As already explained, the Fund filed a motion for declaratory judgment that the Fund not be liable until OHIC's $20,400,000 policies are exhausted, which the trial court granted. On the eve of trial and the same day the Hegartys settled with the Medical College, the Fund, and a number of the physicians, Banks requested that he be allowed to participate in the trial as "coverage counsel." Both the Hegartys and Children's opposed the request. The court ruled that Banks could not participate in the trial because OHIC's interests were already adequately represented, as both Children's and Dr. Beauchaine had attorneys, and there was therefore "no adversity established to justify him to participate." The court stated that OHIC had "no more special status" than "any other insurance company at what they have to pay." The court explained:

> OHIC through their [sic] attorney, Mr. Banks will not be allowed to participate, ask questions, or participate in any way. He surely can be here. He can confer with those attorneys that may help his case or his issues of [sic] theory, but he'll have no direct control as far this Court is concerned.

¶ 86. During trial, at the jury instruction special verdict conference and at the hearing on the motions after verdict, Banks nonetheless attempted to speak, but was stopped by the court for failing to follow the court's ruling.

¶ 87. OHIC cites *Kiviniemi v. American Mutual Liability Insurance Co.*, 201 Wis. 619, 231 N.W. 252 (1930), and *Peissig v. Wisconsin Gas Co.*, 155 Wis. 2d 686, 456 N.W.2d 348 (1990), as support for its position that the trial court erred in prohibiting OHIC's counsel from participating in the trial. OHIC notes that in *Kiviniemi*, this court affirmed the trial court's decision to permit counsel for the insurance company to ask questions of witnesses "in every instance where the interests of the insured and the insurance company were adverse." *Id.*, 201 Wis. at 624. In *Peissig*, the defendant-subrogees were permitted to participate on a limited basis to protect their interest since there was no assignment or agreement in effect between the plaintiffs and the subrogated parties. *Id.*, 155 Wis. 2d at 702. On this basis, OHIC asserts that the trial court erroneously viewed Attorney Banks's request to participate as a claim that OHIC had special status by likening OHIC's status in this case to any other insurance company, when in reality the trial court "overlooked the fact that an issue existed as to whether Beauchaine was conducting the business of [Children's] on March 20–21, 1996."

¶ 88. OHIC instead contends that "[t]he unresolved question of Beauchaine's status meant that OHIC was not 'like any other insurance' company that is named as a defendant," but "[t]he fact that OHIC and its insured [Children's] were at odds with each other on the answer to the conducting the business of questions required OHIC to retain separate counsel to represent

130

its own interest in the case." Accordingly, OHIC maintains that because Banks was involved in this case only to protect OHIC's umbrella policy "as counsel for a named defendant with a $20 million umbrella policy at stake," he should have been allowed to fully participate in the proceedings to protect OHIC's interest.

¶ 89. The Hegartys respond that the trial court correctly denied Banks the right to participate because there were no unresolved coverage issues, since OHIC had admitted that its policies provided $20,400,000 in coverage to Dr. Beauchaine, and since Banks represented OHIC's interests only as they relate to Children's, while Weir represented Children's, their interests were thus not adverse. The Hegartys also disagree that there was an issue as to whether Dr. Beauchaine was "conducting the business of" Children's on March 20–21 because Dr. Beauchaine admitted that she was employed by MCWAH, and none of the defendants moved for declaratory judgment or raised the "conducting the business of" issue in their pleadings or at trial.

■■■■

¶ 90. The general rule is that the "extent of the manner and even the right of multiple cross-examination by different counsel representing the same party can be controlled by the trial court so that the trial proceeds in an orderly and fair manner." *See Hochgurtel v. San Felippo*, 78 Wis. 2d 70, 88, 253 N.W. 2d 526 (1977) (citation omitted). This exercise of discretion by the trial court must be dependent upon the circumstances of the trial. *Id.* This court will reverse only if it clearly appears that the trial court erroneously exercised its discretion and that "the error affected a substantial right of the complaining party and probably affected the result of the trial." *Id.*

131

¶ 91. This issue seems to have arisen out of the Fund's motion for declaratory judgment. The heart of the trial court's decision not to permit Banks to participate was that there simply was no need for Banks to function as, in the words of Banks himself, "coverage counsel," because the court had already established via the declaratory judgment that OHIC's primary and umbrella policies had to be exhausted before the Fund had exposure and that as such there was no longer an issue with respect to OHIC's coverage.

¶ 92. OHIC's arguments focus not on the declaratory judgment and its own pretrial admissions that led to it, but rather, they seek to resurrect an issue concerning the "conducting the business of" language from Wis. Stat. § 655.23(5) by claiming that OHIC had a separate interest in protecting the umbrella policy that needed separate "coverage counsel."

¶ 93. However, we have already determined, in section A.2.b.ii of this opinion, that the trial court did not err in refusing to include a "conducting the business of" question on the special verdict form. Likewise, in section A.1 of this opinion, we determined that the trial court did not err in granting the Fund's motion for declaratory judgment based on OHIC's pretrial admissions. We thus have already resolved the issue of OHIC's coverage, and it follows that there was no need for a "coverage counsel" because it was no longer an issue, given the response to the request for admissions. For this reason, we are unpersuaded by OHIC's claim that Banks should have been allowed to "protect" OHIC's umbrella policy, and that OHIC's interests were adverse to those of Children's because there was no longer an issue with respect to whether the umbrella policy provided coverage. Because the issue had been

resolved, there was no adversity. Since there was no adversity, we also reject OHIC's claim that the trial court misinterpreted OHIC's role in not acknowledging that OHIC had a special status, adverse to Children's. The trial court's exercise of discretion in finding no adversity of interest between Children's and OHIC was thus proper. *See Hochgurtel*, 78 Wis. 2d at 88.

¶ 94. With respect to *Kiviniemi* and *Peissig*, we agree with the Hegartys that these cases are inapplicable because in *Kiviniemi*, there was adversity between the insurance company and the insured, and *Peissig* involved attorneys who represented parties whose interests were at times dissimilar. As explained above, this was not the case here.

¶ 95. Moreover, OHIC has not shown that the outcome would have been different had Banks been permitted to participate. OHIC fails to develop this argument, beyond the sentence stating: "The denial of OHIC's right to have counsel represent its interests in the case clearly affected the result of the trial as OHIC's contentions were not even considered by the jury." Not only is this argument not sufficiently developed, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), but it also reiterates the same issue regarding "interests" we already rejected above.

### 4. Settlement Documents

¶ 96. OHIC contends that it was entitled to copies of any and all settlement documents that the plaintiffs entered into in the case.

¶ 97. On the eve of the trial, October 1, 2004, the Hegartys entered into a settlement agreement with the Fund and the Medical College, as well as a number of doctors who were employees or former employees of

Children's, including Drs. Stremski and Balint. Dr. Beauchaine and her insurer, OHIC, Children's, and MCWAH were not parties to the agreement. On October 12, 2004, OHIC made an oral motion to compel the disclosure of "all settlement and/or releases that the plaintiff has entered into . . . in this case," and made an offer of proof. Counsel for the Hegartys stated that the settlement agreement was not a *Pierringer* release,[25] and that the parties had agreed to keep the terms confidential, unless the court ordered its production. The court denied OHIC's motion, finding that OHIC had not shown bias or prejudice that would necessitate the admission of the agreement, stating:

> I don't see any prejudice or bias now and I don't think it's relevant. It's really—at this level, it's none of the defense['s] business. They do what they do and I don't think any—for professional or other witnesses that they are going to be prejudiced by the fact that their insurance company has been paid some money. They will testify to the facts and I'm sure of that, and it's not relevant at this level and it will not be ordered.

¶ 98. On October 14, 2004, OHIC filed a motion for reconsideration and a writ of mandamus to compel the Fund to provide them a copy of the agreement

---

[25] As explained by the supreme court in *VanCleve v. City of Marinette*, 2003 WI 2, 258 Wis. 2d 80, 655 N.W.2d 113:

> [A] *Pierringer* release, in effect, limits a second joint tort-feasor's liability to the amount reflecting its proportion of wrongdoing. Stated differently, a *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants.

*VanCleve*, 258 Wis. 2d 80, 39 (citing *Pierringer*, 21 Wis. 2d at 193; footnote omitted).

pursuant to the Wisconsin Open Records statute, WIS. STAT. § 19.35. On October 15, 2004, OHIC filed a motion pursuant to WIS. STAT. § 893.55(7).[26] The trial court denied both motions and the writ of mandamus. In motions after verdict, OHIC again sought to obtain copies of the settlement agreement. The trial court denied the motions, stating that OHIC lacked standing to make the request because its insured, Children's, had been dismissed from the case. In support of their motions after verdict, the Hegartys submitted copies of the settlement agreement to the trial court for an *in camera* inspection.

¶ 99. The general rule is that settlement agreements are not admissible to prove liability. WIS. STAT. § 904.08. Section 904.08 provides:

> Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

¶ 100. The statute also sets forth an exception that permits, but does not require, the admission of settlement evidence:

---

[26] WISCONSIN STAT. § 893.55, entitled "Medical malpractice; limitation of actions; limitation of damages; itemization of damages," provides, in relevant part:

> (7) Evidence of any compensation for bodily injury received from sources other than the defendant to compensate the claimant for the injury is admissible in an action to recover damages for medical malpractice. This section does not limit the substantive or procedural rights of persons who have claims based upon subrogation.

This section does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, proving accord and satisfaction, novation or release, or proving an effort to compromise or obstruct a criminal investigation or prosecution.

*Id.*

¶ 101. OHIC asserts that the case law in Wisconsin supports its contention that it is entitled to obtain copies of any settlement agreement. First, citing *Balk v. Farmers Insurance Exchange*, 138 Wis. 2d 339, 347, 405 N.W.2d 792 (Ct. App. 1987) for the proposition that a general release of one tortfeasor releases all joint tortfeasors, OHIC asserts that "if the plaintiffs in this case obtained a general release from any of the settling defendants, they may have in fact released their claims against the non-settling defendants." OHIC claims that, consistent with *Swanigan v. State Farm Insurance Co.*, 99 Wis. 2d 179, 299 N.W.2d 234 (1980), in which the court relied on the language of a *Pierringer* release to determine that it did not release the party in question, OHIC, too, is entitled to the settlement agreement to determine its effect.

¶ 102. OHIC thus contends that it has a right to know whether the settling defendants received a *Pierringer* release because, if the settlement agreement is a *Pierringer* release, this would impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants. Acknowledging the Hegartys' counsel's proclamation that the agreement is not a *Pierringer* release, OHIC maintains that the label a party attaches to a release is not always accurate, necessitating a thorough review of the release.

¶ 103. Finally, OHIC also relies on the holding in *Hareng v. Blanke*, 90 Wis. 2d 158, 168, 279 N.W.2d 437 (1979), that while WIS. STAT. § 904.08 sets forth a limited privilege against disclosure of settlements, evidence of settlement agreements may be used to show bias or prejudice of a witness, *Hareng*, 90 Wis. 2d at 168, to assert that because its requests to obtain copies of the agreement was denied, the defendants were precluded from using evidence of settlement to prove bias or prejudice of a witness at trial.[27]

¶ 104. The Hegartys argue that OHIC misunderstands the holding in *Hareng* because "the mere fact of a settlement does not automatically make the settlement admissible to prove bias or prejudice." They

---

[27] OHIC also asserts that "despite the fact that Beauchaine had an employment agreement with MCWAH, MCWAH undertook an active and adversarial role against its own employee" and "[t]he only explanation for such unusual behavior is that MCWAH struck some sort of secret deal with the plaintiffs regarding its exposure in the case," making it imperative that the non-settling defendants have access to this "secret agreement." It is unclear why OHIC engages in such speculation about MCWAH and why OHIC feels that the settlement agreement should have been disclosed as a result of MCWAH allegedly adopting an adversarial position against Dr. Beauchaine because MCWAH was not a party to the agreement.

OHIC further argues that its writs of mandamus should have been granted. As the trial court correctly noted, OHIC lacked standing to bring a writ of mandamus against Milwaukee County because standing would have required that OHIC have a clear legal right of relief, that Milwaukee County, to whom the writ was directed, have a positive and plain duty, and that OHIC suffered substantial damages due to nonperformance. Because these conditions were not established to the trial court's satisfaction, the trial court correctly refused to issue the writ. We therefore will not further address this argument.

instead rely on *Morden v. Continental AG*, 2000 WI 51, 235 Wis. 2d 325, 611 N.W.2d 659, for their contention that despite an oral motion, two writs of mandamus and a motion for reconsideration, OHIC has failed to make the requisite threshold showing that a witness changed his or her testimony or that a party changed its position. *See id.*, ¶ 42. The Hegartys disagree with OHIC's claim that because a settlement agreement may affect the plaintiff's recovery rights against non-settling defendants, a non-settling defendant is entitled to obtain a copy of the settlement agreement and note that there is no case law to that effect. They also claim that even if the trial court erred in failing to order the disclosure of the settlement agreement, the error was harmless. In addition, they note that they filed the settlement agreement with the trial court under seal because all the settling parties had agreed that the agreement was to remain confidential, unless the court issued an order to the contrary for good cause, and insist the trial court's *in camera* review of the agreement was a proper exercise of discretion.

¶ 105. In its reply, OHIC asserts that *Morden* in fact supports its argument that it is entitled to copies of the agreement because there the terms of the agreement, a settlement for $500,000, and a covenant not to sue, were known to the parties.[28]

---

[28] OHIC also suggests that "[b]y submitting copies of the agreements to the court for an *in camera* inspection in support of their motions after verdict the Hegartys admit that the settlement agreements affect their recovery right against OHIC." OHIC contends that it should not have to rely on the Hegartys' characterization of what they contend are the legal effects of the agreement. Because we remand this issue to the trial court for further proceedings, we decline to further comment on the character of the agreement. As to the Hegartys'

¶ 106. We cannot agree with the Hegartys that the trial court's refusal to compel disclosure of the settlement agreement was proper. We begin by noting that this issue centers around the fact that the terms of the agreement were not known to OHIC. We agree with OHIC that *Morden* does not support the Hegartys because, in *Morden*, the terms of the agreement were known to the parties, and as such, *Morden* is inapplicable to this case. Indeed, because the terms of the agreement were not known to all parties, contrary to the assertions of both the Hegartys and OHIC, we are not in a position to address whether WIS. STAT. § 904.08 applies to this case.

¶ 107. Rather, this is, at its core, a discovery issue. "The standard of review of a discovery order is whether the trial court erroneously exercised its discretion in ordering or prohibiting the discovery." *Rademann v. State Dept. of Transp.*, 2002 WI App 59, ¶ 34, 252 Wis. 2d 191, 642 N.W.2d 600. "The burden is on [the appellant] to show that the trial court misused its discretion and we will not reverse unless such misuse is clearly shown." *Lane v. Sharp Packaging Systems, Inc.*,

---

post verdict motion, to which OHIC alludes, we reach the effect of the Hegartys' refusal to disclose the settlement in section C.1 of this opinion.

Additionally, OHIC also argues that the trial court erred in failing to order the production of the settlement agreement and/or release pursuant to WIS. STAT. § 893.55(7). Once again, because we remand this issue to the trial court for further proceedings on the issue, we need not further address the applicability of § 893.55(7) in this context. Section 893.55(7) will, however, be addressed in further detail in section C.2. of this opinion, where we conclude that the trial court properly applied it in a different context.

2002 WI 28, 251 Wis. 2d 68, 640 N.W.2d 788 (citation omitted; alteration in original). We will affirm a discretionary decision by the trial court if the record shows that the trial court "considered the facts of the case and arrived at a reasonable conclusion based on the applicable law." *Manke v. Physicians Ins. Co. of Wisconsin, Inc.*, 2006 WI App 50, ¶ 17, 289 Wis. 2d 750, 712 N.W.2d 40.

¶ 108. We conclude that the trial court did erroneously exercise its discretion in refusing to order the production of the settlement agreement. In making its decision to deny OHIC's requests for the settlement documents, the trial court examined the relevance of the settlement agreement, *see* WIS. STAT. RULE 904.02 ("Evidence which is not relevant is not admissible."), and articulated reasons for why it concluded that it was not relevant. The trial court did not, however, conduct an *in camera* review of the actual document prior to ruling on the motion.

¶ 109. In filing their post-verdict motions, the Hegartys filed the confidential settlement agreement with the trial court under seal along with their motions. In ruling on post-verdict motions, the trial court did review the agreement *in camera,* and could have granted OHIC's motion had it determined that the agreement had been erroneously excluded, but, presumably mindful of the terms of the agreement, the trial court agreed that the agreement had been properly excluded and denied the motion.

¶ 110. We conducted an *in camera* review of the document and are unable to agree with the trial court. Upon our independent review of the settlement agreement, we have come to the conclusion that it is unclear whether the agreement is or is not a *Pierringer* release, as the document appears to contain aspects of a *Pierringer* release. We are satisfied that in order to deter-

mine the true character of the agreement, it will be necessary for OHIC to have access to the settlement agreement, and we therefore order its disclosure to OHIC. Accordingly, we remand this issue to the trial court for further proceedings.[29]

### 5. *Jury Instructions Prior to Jeremiah Hegarty's Testimony*

¶ 111. OHIC contends that the trial court erred when it read jury instructions on damages prior to the testimony of plaintiff Jeremiah Hegarty.

¶ 112. On October 13, 2004, the Hegartys called Sarah's father, Jeremiah Hegarty, to testify. The previous fifteen witnesses who had testified had provided mostly medical testimony. Before Sarah's father's testimony, the court indicated to the jury that the testimony would now be "going from liability [to] damages." The court also read two jury instructions on damages, WIS JI—CIVIL 1766 regarding pain and suffering, and WIS JI—CIVIL 1837 regarding a parent's loss of society and companionship. None of the parties requested the reading of the instructions, and the court did not consult with any of the parties prior to reading them. OHIC objected to the reading of the jury instructions on grounds that it unduly emphasized the damage issues and moved for a mistrial. Dr. Beauchaine and Children's

---

[29] OHIC also contends that the trial court erred in denying its motion after verdict on grounds that it lacked standing because the trial court overlooked the fact that when OHIC first requested the disclosure of the agreement Children's was still a party, the agreement has an effect on not just Children's but all the non-settling parties, and the agreement may have bearing on the amount that OHIC might ultimately owe. Because we remand this issue to the trial court for further proceedings, we need not address the trial court's ruling on the issue of standing at this time.

did not join OHIC's motion for a mistrial. The trial court denied the request for a mistrial.

¶ 113. OHIC maintains that the trial court should have granted its motion for mistrial because reading the damage jury instructions was "not only unwarranted, it also served to unduly underscore the damage issues in the case" in the middle of trial. Insisting that Jeremiah Hegarty's testimony was critical to the plaintiff's damage claim, OHIC asserts that there was no evidence that the jury needed to be alerted to the nature or relevance of his testimony because it was not "so complicated and technical that the jury could not figure out on its own how the testimony fit into the case."

¶ 114. The Hegartys respond that the reading of the jury instructions was a proper exercise of discretion and cite WIS. STAT. § 805.13(2)(b), which allows the court to give preliminary instructions. They also submit that because OHIC challenges merely the timing of the instructions, not the instructions themselves, and because the court did not make any comments about the weight of the evidence or express any opinions about the testimony, it does not necessitate a mistrial, and that, as such, any possible error was harmless. The Hegartys also call the claim of error "disingenuous to say the least," because local media outlets reported OHIC's counsel as saying that the size of the jury verdict was expected. In its reply, OHIC insists that the instructions do not qualify as preliminary instructions under WIS. STAT. § 805.13(2)(b) because the court did not consult with counsel prior to reading the instruction as required by the statute.

¶ 115. We agree with the Hegartys. Under WIS. STAT. § 805.13(2)(b), "The court may give additional preliminary instructions to assist the jury in under-

142

standing its duty and the evidence it will hear." However, 805.13(2)(b) also specifically requires that "[t]he additional preliminary instructions shall be disclosed to the parties before they are given and either party may object to any specific instruction or propose instructions of its own to be given prior to trial."

¶ 116. We agree with OHIC that because the instructions were not disclosed to the parties before they were read by the court the reading of the instruction does not qualify as a preliminary instruction under WIS. STAT. § 805.13(2)(b). We nonetheless cannot agree that the reading of the jury instructions constituted reversible error. The trial court has broad discretion over the conduct of litigation. *Wengerd v. Rinehart*, 14 Wis. 2d 575, 580–81, 338 N.W.2d 861 (Ct. App. 1983). Having reviewed the record, we are convinced that the court simply saw a need to orient the jury to the subject matter of the testimony, since the evidence was jumping from expert testimony to fact testimony to damage testimony in a long and complex trial. We are satisfied that the court was merely trying to keep the jury properly focused. Accordingly, the trial court's decision to read the jury instructions was a proper exercise of discretion and the court properly denied OHIC's motion for mistrial.

### B. Dr. Beauchaine and OHIC's Combined Appeal

#### 1. Applicability of WIS. STAT. § 893.55(4) to Dr. Beauchaine

¶ 117. Beauchaine/OHIC contend that the trial court erred as a matter of law in ruling that WIS. STAT. § 893.55(4) did not apply to Dr. Beauchaine. We disagree.

¶ 118. On March 26, 2004, Dr. Beauchaine moved for a declaratory judgment that the Hegartys' claims for non-economic damages were subject to the limit of Wis. Stat. § 893.55(4). After our holding in *Phelps*, that first-year medical residents like Dr. Beauchaine are not "health care providers" within the meaning of § 893.55(4), the parties agreed that this was no longer an issue. *Phelps*, 273 Wis. 2d 667, ¶ 41.

¶ 119. At the time Beauchaine/OHIC filed their brief-in-chief and the Hegartys filed their response, *Phelps* was pending before the Wisconsin Supreme Court. Both parties recognized the decision of this court, *see Phelps*, 273 Wis. 2d 667, but acknowledged that the disposition of the issue would depend on the outcome at the supreme court.

¶ 120. By the time Beauchaine/OHIC filed their reply brief, the supreme court had handed down its decision in *Phelps* affirming our holding that first-year medical residents are not "health care providers" under Wis. Stat. § 893.55(4). *Phelps*, 282 Wis. 2d 69, ¶ 64. Beauchaine/OHIC's reply brief does not, however, discuss the fact that the supreme court held that she is not a "health care provider" under 893.55(4). Rather, the brief focuses on an issue that the supreme court explicitly declined to address, namely, whether a first-year resident qualifies as a borrowed employee of a health care provider, *id.*, 282 Wis. 2d 69, ¶ 65, and directs us to the arguments about her being a borrowed employee presented in OHIC's brief. The borrowed employee issue is addressed in section A.2.b.i of this opinion.[30]

---

[30] Beauchaine/OHIC's reply brief also references the recent case of *Ferdon ex rel. Petrucelli v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, in which our supreme court held that the noneconomic medical

¶ 121. In light of the supreme court affirming our decision in *Phelps*, this issue is now resolved. WISCONSIN STAT. § 893.55(4) does not apply to Dr. Beauchaine, *Phelps*, 282 Wis. 2d 69, ¶ 64, and the trial court did not err in so ruling.

### 2. *Pre-Death Loss of Society and Companionship*

¶ 122. Beauchaine/OHIC contend that the trial court erred as a matter of law in permitting an un-

___

malpractice damages caps set forth in WIS. STAT. § 893.55(4)(d) are unconstitutional. They argue adamantly against *Ferdon* being applied retroactively, but nonetheless claim that even so, "the question of whether Beauchaine was acting as a borrowed employee of a health care provider is still relevant to whether she is entitled to the wrongful death caps of WIS. STAT. 893.55(4)(f) and 895.04(4), which survived the *Ferdon* decision." The Hegartys filed a *sur reply* brief addressing the implications of *Ferdon* to this case. They argue that *Ferdon* has no applicability to this case, and therefore assert that Beauchaine/OHIC's alternative arguments based on *Ferdon* are "a thinly veiled attempt by their counsel to obtain an advisory opinion from this court for use in other pending litigation."

*Ferdon* is irrelevant to this case. WISCONSIN STAT. § 893.55(4)(d), the statute held unconstitutional in *Ferdon*, applied to WIS. STAT. ch. 655 "health care providers" only, and per *Phelps*, Dr. Beauchaine is not a ch. 655 "health care provider." Nothing in *Ferdon* suggests that the ruling was intended to have a wider application. Beauchaine/OHIC's attempt to argue that Dr. Beauchaine was a loaned or borrowed employee has already been rejected in section A.2.b.i of this opinion. Because *Ferdon* would not affect this case, even if it was applied retroactively, we need not address the question of retroactive application. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to address non-dispositive issues). We therefore also decline the Hegartys' invitation to speculate about what Beauchaine/OHIC's possible motivation might have been for arguing both that *Ferdon* cannot be applied retroactively and, in the alternative, that the case does not defeat their argument.

145

capped pre-death award for loss of society and companionship damages to Sarah's parents.

¶ 123. The trial court capped the Hegartys' "post-death" loss of society and companionship claim at $150,000, pursuant to WIS. STAT. § 895.04, but allowed the jury to consider a separate question of the Hegartys' "pre-death" loss of society and companionship for the time after the alleged negligence until Sarah's death, that is, March 16, 1998. The jury awarded $3,500,000 to each parent for "pre-death" loss of society and companionship. In motions after verdict, Beauchaine/OHIC moved for a directed verdict to limit the award for pre-death loss of society and companionship. The trial court denied the motion, concluding that, "I think it's clear there are two separate causes of action for loss of consortium pre-death and post-death causes of action. And there is a different type of loss one suffers pre and post. I think the law is clear on this."

¶ 124. The question of whether a parent's right to recover damages for the "pre-death" loss of society and companionship of an injured minor is a question of law that we review *de novo*. *Pierce v. Physicians Ins. Co. of Wis., Inc.*, 2005 WI 1, ¶ 10, 278 Wis. 2d 82, 692 N.W.2d 558. Beauchaine/OHIC present three arguments. We address each in turn.

### a. *Separate Recovery for Pre-Death and Post-Death Loss of Society and Companionship*

¶ 125. Beauchaine/OHIC argue that the Hegartys were not entitled to claim separate pre-death loss of society and companionship damages in addition to wrongful death loss of society and companionship damages.

146

¶ 126. The Hegartys assert that Beauchaine/ OHIC waived the argument that their pre-death loss of society and companionship claim did not survive Sarah's death because Dr. Beauchaine failed to raise the defense in her answers to the complaint and amended complaint, and by the February 6, 2003 dispositive motion filing date, and did not raise the issue "until the day of closing arguments." We disagree. The record reveals that the issue of separate pre- and post-death verdict questions was first discussed at the close of evidence during the jury instruction and special verdict conference on October 19, 2004. The court first re-marked that:

> It seems to me there should be two separate questions about loss of society and companionship. They lost two years of society and companionship because of her injury so there should be a question about that, and then they have lost society and companionship because of her death. I think there should be [a] question about that. I think there should be a separate question for the mother and [a] separate question for the father and it should not be joined . . . .

¶ 127. After some discussion, it was agreed that the post-death award for loss of society and companion-ship is capped at $150,000 for a non-Wis. Stat. ch. 655 case. Counsel for the Hegartys then added that Sarah's parents' loss of society and companionship during the two years before Sarah's death is unlimited and agreed that for purposes of the post-death award the parents could be together, but asked that the parents be sepa-rate for purposes of the pre-death award.

¶ 128. Counsel for Dr. Beauchaine objected to the court's proposal for separate questions for loss of society and companionship pre- and post-death, stating:

147

I'm not aware of any basis to have a wrongful death/loss of society and companionship claim and then a second one relating to the death. It is, in effect, a wrongful death action, and while there certainly is – a recovery for pain and suffering prior to death in the matter, I don't know of any basis in law to separate out.

¶ 129. Dr. Beauchaine's counsel filed a brief "supporting jury instruction and verdict precluding plaintiffs from recovering loss of society and companionship for the period between March 20–21, 1996[,] and March 16, 1998." Although the court ultimately disagreed with Dr. Beauchaine and kept the pre- and post-death loss of society and companionship questions separate, we disagree with the Hegartys that Dr. Beauchaine waived her argument on this issue. Accordingly, we reach the merits of Beauchaine/OHIC's argument.

¶ 130. Beauchaine/OHIC base their argument on the principle that actions available at common law are extinguished at the decedent's death, absent a statutory provision to the contrary, and cite the survival statute, Wis. Stat. § 895.01, and the wrongful death statute, Wis. Stat. § 895.04. They contend that while claims for damages for pain and suffering of a deceased survive the decedent's death and pass to the estate under § 895.01, the statute provides only that the decedent's claims survive and does not provide that a parent's pre-death loss of society and companionship claim separately survives the decedent's death.

¶ 131. With respect to Wis. Stat. § 895.04, they argue that while the statute permits parents of a deceased minor to bring claims for loss of society and companionship, it does not allow a post-death filing of a pre-death claim. Accordingly, they argue that "in the context of death, 'loss of society and companionship' damages . . . necessarily measure the total loss to the

parents of the child's society and companionship" and claim that "[b]y artificially 'time-dividing' this element – and 'capping' only the post-death loss – the circuit court effectively eliminated the cap of the wrongful death statute." We disagree.

¶ 132. Beauchaine/OHIC seem to misinterpret the meaning of WIS. STAT. § 895.01. Section 895.01, the survival statute, merely sets forth instances in which causes of action survive the death of an individual who had that cause of action prior to death. While Beauchaine/OHIC are correct in recognizing that claims for damages due to pain and suffering of the deceased survive the decedent's death and pass to the decedent's estate under 895.01, *see Lord v. Hubbell, Inc.*, 210 Wis. 2d 150, 165, 563 N.W.2d 913 (Ct. App. 1997), they misapply the statute to the issue before us. What matters for purposes of the Hegartys' claim is not Sarah's claim for pain and suffering, rather, it is the parents' loss of their daughters' society and companionship.

¶ 133. The supreme court addressed loss of society and companionship in *Shockley v. Prier*, 66 Wis. 2d 394, 404, 225 N.W.2d 495 (1975), and *Kottka v. PPG Industries, Inc.*, 130 Wis. 2d 499, 515, 388 N.W.2d 160 (1986). Beauchaine/OHIC recognize that under *Shockley*, an injury to a minor child may result in a claim for his or her own injury and a claim for the parent's loss of the child's aid, comfort, society and companionship, but assert that a parent's claim may be brought only "provided, and on condition, that the parent's cause of action is combined with that of the child for the child's personal injuries." Beauchaine/OHIC also acknowledge that in *Kottka*, recovery for both pre- and post-death loss of consortium was permitted, but they claim that the case is distinguishable "because there the claimant filed her claim

*prior to the decedent's death*" (emphasis in brief). They also maintain that *Kottka* is "irrelevant" because the case did not discuss whether the combined pre- and post-death loss claim could exceed the cap of the wrongful death statute.

¶ 134. The Hegartys respond that a claim for "pre-death" loss of society and companionship is separate from a wrongful death claim for loss of society and companionship, and that damages for each are separately recoverable. They contend that Beauchaine/OHIC misread *Shockley*, and that *Shockley* in fact recognized the right of the parents of an injured minor child to recover for the loss of their child's society and companionship. They insist that this issue is indeed controlled by *Kottka*, which they note relied on *Shockley* in reaching the conclusion that recovery for both pre- and post-death loss was allowed. We agree.

¶ 135. In *Shockley*, our supreme court recognized a parent's right to recover for the loss of the society and companionship of an injured child by specifically mentioning the unfairness of a parent being able to do so only if the child dies:

> What is said with respect to parental loss in the event of death of a child is equally true in the case of injury. Our wrongful death statute already recognizes the loss of society and companionship as an element of damages in the case of death. It seems reasonable to recognize this same type loss where there has been injury to a minor child.

*Id.*, 66 Wis. 2d at 400. We disagree with Beauchaine/OHIC that *Shockley* established as a prerequisite for a claim for loss of society and companionship claim by a

parent that there exist a simultaneous personal injury claim by the child.

¶ 136. *Kottka* involved the widow of a worker who died from exposure to chemicals where the worker's compensation carrier sought reimbursement for the pre-death portion of a settlement that had provided payments for both pre- and post-death loss of consortium/society and companionship. *Id.*, 130 Wis. 2d at 516. Relying on *Shockley*, the supreme court reasoned:

> When we first recognized a common-law cause of action for parental loss in the event of negligent injury to a minor child, we distinguished the parents' recovery for loss of a child's society and companionship, as an element of statutory damages for wrongful death, from the parents' recovery for the same type of loss during the life of the injured child in order to provide a remedy for the actual losses which injury to a child causes to the parents. *Shockley v. Prier,* 66 Wis. 2d 394, 400–01, 255 N.W.2d 495 (1975). The same policy leads us in this case to distinguish Janet Kottka's claim for loss of William Kottka's society and companionship resulting from his death from her claim for loss of consortium between the time of William's alleged injury and his death.

*Id.*, 130 Wis. 2d at 517. The court rejected the worker's compensation carrier's argument and concluded:

> [W]e reject the argument of the insurers that sec. 895.04(4), Stats., provides Janet Kottka's only right to recover for loss of William's society and companionship and hold that Janet Kottka's right to recover damages for her loss of society and companionship resulting from William's death pursuant to sec. 895.04(4) is *additional to* her common law right to recover damages for loss of consortium prior to William's death.

*Id.* at 520–21 (emphasis added).

151

¶ 137. We are not convinced by Beauchaine/ OHIC's assertion that *Kottka* is distinguishable on grounds that the decision establishes a requirement that there be a pending lawsuit at the time of death in order to recover "pre-death" loss of society and companionship damages, and agree with the Hegartys that the court's holding did not turn on whether there was a pending lawsuit when the husband died.

¶ 138. We are satisfied that under *Kottka* and *Shockley*, parents of minor children have separate claims for pre-death and post-death loss of society and companionship, and damages are not capped by the wrongful death limit. The trial court thus did not err in allowing recovery for both.[31]

*b. Wrongful Death Caps*

¶ 139. Beauchaine/OHIC next argue, in the alternative, that even if the Hegartys' pre-death claim for loss of society and companionship were separately recoverable, it is capped by WIS. STAT. §§ 895.04 and 893.55(4)(b). They contend that § 895.04 caps the damages because in the context of death, loss of society and companionship "is not a divisible injury as it inherently measures the parents' *total* loss . . ." and "artificially divid[ing] such a claim both permits 'stacking' and double recovery" (emphasis in brief). Beauchaine/OHIC rely on *Maurin v. Hall*, 2004 WI 100, ¶ 23, 274 Wis. 2d 28, 682 N.W.2d 866, especially the supreme court's

---

[31] OHIC also claims that the circuit court denied their post-verdict motion "without analysis." A review of the record reveals that the court in fact denied their motion based on the holdings in *Shockley v. Prier*, 66 Wis. 2d 394, 404, 225 N.W.2d 495 (1975), and *Kottka v. PPG Industries, Inc.*, 130 Wis. 2d 499, 515, 388 N.W.2d 160 (1986).

reliance on § 893.55(4)(b)[32] in *Maurin*, for support of their contention that plaintiffs are precluded "from 'stacking' the noneconomic damage caps for a parent's wrongful death claim and the Estate's pain and suffering claim." They conclude that "[u]nder *Maurin*, the separate $3,500,000 awards to each of the Hegartys must be stricken as a matter of law," and the Hegartys' total recovery for both pre- and post-death loss of society and companionship should be reduced to $150,000.

¶ 140. The Hegartys disagree that *Maurin* limits their recovery to $150,000, insisting that *Maurin* applies only within the context of Wis. Stat. ch. 655 and Dr. Beauchaine's liability is not based on ch. 655 or Wis. Stat. § 893.55(4).

¶ 141. We disagree with Beauchaine/OHIC. *Maurin* involved a Wis. Stat. ch. 655 "health care provider." As noted, and as the parties agree, under *Phelps*, Dr. Beauchaine was not a ch. 655 "health care provider," and is therefore not subject to the Wis. Stat. § 893.55(4) caps. *Phelps*, 282 Wis. 2d 69, ¶ 64. Hence, the supreme court's discussion in *Maurin* about § 893.55(4) is irrelevant. As explained in the previous subsection, *Kottka* and *Shockley* give the Hegartys a common law right to

---

[32] Wisconsin Stat. § 893.55(4)(b) provides:

The total noneconomic damages recoverable for bodily injury, including any action or proceeding based on contribution or indemnification and any action for a claim by a person other than the injured person for noneconomic damages recoverable for bodily injury, may not exceed the limit under par. (d) for each occurrence on or after April 6, 2006, from all health care providers and all employees of health care providers acting within the scope of their employment and providing health care services who are found negligent and from the injured patients and families compensation fund.

recover for both pre- and post-death loss of society and companionship: *Maurin* does not alter our conclusion.[33] The trial court did not err in allowing separate recoveries.

### c. *Jury Award Based on Impermissible Factors*

¶ 142. Finally, Beauchaine/OHIC argue that the trial court erred as a matter of law in submitting a separate pre-death loss of society and companionship question to the jury. They assert that the jury's $7,000,000 award for pre-death loss of society and companionship "is the product of invited error" because the jury misunderstood the question in light of the Hegartys' closing argument which emphasized what Sarah's parents went through. They claim the award was in fact an impermissible award for Sarah's parents' pain and suffering, not for the love, affection, care and protection that her parents would have received from their child had the child not been injured, as it should

---

[33] Although, as explained *Maurin v. Hall*, 2004 WI 100, ¶ 23, 274 Wis. 2d 28, 682 N.W.2d 866, is not applicable to the case before us, we note that the portion relied upon by Beauchaine/OHIC has since been overturned by the Wisconsin Supreme Court. In *Bartholomew v. Wisconsin Patients Compensation Fund & Compcare Health Services Insurance Corp.*, 2006 WI 91, ¶ 3, 293 Wis. 2d 38, 717 N.W.2d 216, the supreme court recently explicitly overturned the portion of *Maurin* that held that when a victim of medical malpractice dies, the cap for wrongful death actions limits all noneconomic damages, including pre-death noneconomic damages. *Bartholomew*, 717 N.W.2d 216, ¶¶ 35–51. The court concluded: "*Maurin*'s interpretation of Wisconsin's medical malpractice and wrongful death statutes as imposing a single global wrongful death cap on all noneconomic damages is flawed because it failed to take into account the well-established distinction in Wisconsin tort law between actions for predeath damages and actions for postdeath damages (wrongful death actions)." *Id.*, ¶ 127.

have been. As support, Beauchaine/OHIC point to the fact that the jury's $7,000,000 award for Sarah's pain and suffering is the same amount as the parents' combined award for pre-death loss of society and companionship. Citing case law that has viewed recovery for emotional distress with caution, Beauchaine/OHIC claim that because the Hegartys were prohibited from "asserting a claim for negligent infliction of emotional distress, they were nevertheless able to recover such damages under the guise of pre-death 'loss of [society and companionship]' damages." They therefore ask this court to strike the award from the judgment.

¶ 143. The Hegartys disagree, noting that the court properly instructed the jury on what factors to consider and informed the jury that arguments by counsel do not constitute evidence.

¶ 144. We cannot agree with Beauchaine/OHIC. With respect to the verdict question concerning Sarah's parents' pre-death loss of society and companionship, the court instructed the jury as follows:

> This question asks you to determine Jeremiah and Mary Hegarty's loss of society and companionship resulting from injuries sustained by Sarah Hegarty.
>
> Society and companionship includes the love, affection, care, and protection the parent would have received from his or her daughter or child, had the child not been injured. It does not include the loss of monetary support from the child, or the grief or mental suffering caused by the child's injury.
>
> In determining the parents' loss of society and companionship, you consider the age of Sarah Hegarty and the age of the parents, the past relationship between the parents, the love and affection, and conduct of each towards each other, the society and companionship

that has been given to the parents by the child, and the personality, disposition, and character of the child and the parent. The amount inserted by you should reasonably compensate the parents for loss of society and companionship he or she had sustained since the date of diagnosis and treatment on March 20, 1996 up till the time of Sarah Hegarty's death on March 16, 1998.

¶ 145. This instruction was abundantly clear about what the court was asking the jury to determine —even explicitly explaining that loss of society and companionship did *not* include "the grief or mental suffering caused by the child's injury." The jury is presumed to have followed this instruction. *State v. Williamson*, 84 Wis. 2d 370, 396, 267 N.W.2d 337 (1978).

¶ 146. Without even referencing the jury instruction, and the fact that we start with the presumption that the jury followed it, Beauchaine/OHIC instead criticize the Hegartys' closing argument which, in their view, invited the jury's error by emphasizing the Hegartys' plight. However, before counsel gave their closing arguments, the court instructed the jury as follows:

> [Y]ou will hear arguments of counsel. You should carefully consider the closing arguments of the attorneys, but their arguments, conclusions, and opinions are not evidence. Draw your own conclusions and your own inferences from the evidence and answer the questions in the verdict according to the law and my instruction and according to the evidence. Arguments may be helpful to you. They will summarize and tell you their theory, and you may agree with parts of it, you may agree with all of. It may be helpful. You are to make you own decision, okay.

This is an unambiguous instruction telling the jury that arguments are not evidence, which we again presume the jury followed. *See id.*

156

¶ 147. Disregarding this instruction, Beauchaine/ OHIC claim that "[a]ny doubt about this conclusion is resolved" by comparing Sarah's pain and suffering award with her parents' award for loss of society and companionship. They do not, however, explain how the fact that the amounts happen to be the same implies that the jury awarded damages for something other than for what it was instructed to award them. Aside from unsupported assertions about the Hegartys' closing argument and the size of the jury award, Beauchaine/OHIC are unable to point to anything that would give this court a reason to conclude that the jury in fact misunderstood what it was asked to do and erroneously awarded damages for Sarah's parents' emotional distress.

¶ 148. Moreover, as the Hegartys note, in denying Dr. Beauchaine's post-verdict motion, the court found that the evidence clearly supported the jury's award, stating:

> This family is to be commended, and the pain and suffering she went through before she received the proper treatment, it was terrible. She never ate solid foods. Had 89 surgeries, addicted to morphine, had open wounds, went through two organ transplants and loss of any normal relationship between her parents during that time. They surely lost society and companionship because they were unlike, I can't imagine any family doing this, being a total participant in that, and not having their child as a regular child.

¶ 149. We are satisfied that Beauchaine/OHIC's accusation that the Hegartys' loss of society and companionship being an impermissible award for emotional distress in disguise is nothing more than an unsupported speculation.

157

### 3. Fair Trial on Issue of Dr. Beauchaine's Comparative Fault

¶ 150. Finally, Beauchaine/OHIC contend that a new trial is required because the issue of Dr. Beauchaine's comparative fault was not fairly tried as a result of the trial court's evidentiary rulings that violated Wisconsin's comparative negligence law.

¶ 151. "A [trial] court has broad discretion in determining the relevance and admissibility of proffered evidence." *State v. Oberlander*, 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989) (citation omitted). We review the trial court's decision to exclude this evidence under the erroneous exercise of discretion standard. *State v. Walters*, 2004 WI 18, ¶ 13, 269 Wis. 2d 142, 675 N.W.2d 778. "An appellate court will uphold an evidentiary ruling if it concludes that the [trial] court examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.*, ¶ 14. Therefore, this court will not find an erroneous exercise of discretion if a reasonable basis for the trial court's determination exists. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

¶ 152. A new trial will not be granted unless the trial court made an erroneous ruling and the ruling affected the substantial rights of the parties. *See* Wis. Stat. § 805.18 and 901.03.[34] The substantial rights of

---

[34] Wisconsin Stat. § 805.18(2) provides:

No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as

the parties are affected only if there is a reasonable possibility that the error contributed to the outcome of the case. *Martindale v. Ripp*, 2001 WI 113, ¶¶ 31–32, 246 Wis. 2d 67, 629 N.W.2d 698.

¶ 153. In a medical malpractice claim, like in any negligence claim, the plaintiff must establish "(1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages[,]" in short, "a negligent act or omission that causes an injury." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Thus, "[t]o establish liability, a plaintiff must prove not only that the defendant's conduct was negligent, but also that the negligent conduct was 'the cause in fact or a substantial factor in causing the eventual injury.' " *Ollman v. Wisconsin Health Care Liab. Ins. Plan*, 178 Wis. 2d 648, 666–67, 505 N.W.2d 399 (Ct. App. 1993) (citation omitted).

¶ 154. To establish causation in a medical malpractice case where the issues involve technical, scientific or medical matters, beyond the common knowledge or experience of jurors, testimony from medical experts is essential. *Id.* at 667. "[T]he lack of expert testimony on the question of causation results in an insufficiency of proof . . . ." *Bruss v. Milwaukee Sporting Goods Co.*,

to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

WISCONSIN STAT. § 901.03(1) provides: "EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

34 Wis. 2d 688, 696, 150 N.W.2d 337 (1967). Admissibility of expert testimony is governed by WIS. STAT. 907.02,[35] which permits expert testimony if the witness possesses scientific, technical, or other specialized knowledge relevant to a specific question and the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. Section 907.02 " 'continues the tradition of liberally admitting expert testimony' in Wisconsin." *State v. St. George*, 2002 WI 50, ¶ 39, 252 Wis. 2d 499, 643 N.W.2d 777 (citation omitted). Admissibility of expert testimony is generally within the discretion of the trial court. *Martindale*, 246 Wis. 2d 67, ¶ 28. An expert witness is qualified if "he or she has superior knowledge in the area in which the precise question lies." St. George, 252 Wis. 2d 499, ¶ 40 (citation omitted).

¶ 155. In this case, there were six expert witnesses who testified on the issue of causation: for the Hegartys, Dr. Marvin Ament, Dr. Alan Langnas, Dr. Jon Morris, and Dr. Eamonn Quigley; and for the defense, Dr. Ronald Nichols and Dr. Warren Bishop.

### a. Exclusion of Evidence Regarding Possible Negligence after 7:00 a.m. on March 21, 1996

¶ 156. Beauchaine/OHIC contend that the trial court erroneously excluded evidence regarding possible negligence after 7:00 a.m. on March 21, 1996.

¶ 157. Before the start of the trial, the Hegartys moved *in limine* to exclude evidence of possible negli-

---

[35] WISCONSIN STAT. § 907.02 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

gence after 7:00 a.m. on March 21, 1996, that was not causal and that was not established by expert testimony. Prior to trial, all of the Hegartys' experts agreed that surgery would have had to be performed before 6:00 a.m. on March 21, 1996, and reports filed by Dr. Beauchaine's experts indicated that they were unable to identify, to a degree of medical certainty, any causal negligence that occurred after 7:00 a.m. on March 21.

¶ 158. Based on these expert opinions, the court granted the motion explaining:

> It's clear by the testimony, all the relevant testimony that the court has reviewed, that as of seven a.m. on the morning of March 21st, 1996, it was all over. Surgery was the only thing that was going to happen. Anything anybody else would have done to try to remediate her problem wouldn't have had any effect. Surgery was the only answer. So when we talk about what might have happened, who might have done something from seven till the operation is irrelevant and it just would confuse the issues. You can have a different theory about who is responsible during various stages of this activity but not on that stage. Once at seven a.m. it's all over. We are talking about surgery, and that is the only thing, not what somebody may have done, could have done, possibly could have done, should have done, because it has no effect on the causation.

The court therefore ruled that the line of questioning about anything that happened after 7:00 a.m. would not be allowed.

¶ 159. Relying on *Hernke v. Northern Insurance Co.*, 20 Wis. 2d 352, 360, 122 N.W.2d 395 (1963), Beauchaine/OHIC begin by asserting that in medical malpractice cases, the plaintiff must produce testimony based on reasonable medical probabilities, while the defendant may weaken the plaintiff's claim by showing mere possibilities. Beauchaine/OHIC are mistaken.

161

¶ 160. While it is true that a party need not rise to a level of medical probability when cross-examining an opposing party's expert witness regarding matters on which the opposing party bears the burden of proof, *see Zintek v. Perchik*, 163 Wis. 2d 439, 456–58, 471 N.W.2d 522 (Ct. App 1991), *overruled on other grounds by Steinberg v. Jensen*, 194 Wis. 2d 439, 534 N.W.2d 361 (1995), that is not what Beauchaine/OHIC sought to do at trial and not what they are challenging on appeal. Rather, they sought to prove that other physicians were causally negligent. Putting other physicians who treated Sarah after 7:00 a.m. on the special verdict, based on a mere possibility that they might have been negligent, would have invited speculation by the jury and would have been inconsistent with the proper standard; that is, that the jury must be satisfied "by the greater weight of the credible evidence, to a reasonable certainty, that 'yes' should be [the] answer to the verdict questions." WIS JI—CIVIL 200.[36]

¶ 161. Nonetheless, Beauchaine/OHIC contend that at the time the court made its ruling, "the record was replete with evidence that the 'delay' in taking

---

[36] WISCONSIN JI—CIVIL 200 provides:

Certain questions in the verdict ask that you answer the questions "yes" or "no". The party who wants you to answer the questions "yes" has the burden of proof as to those questions. This burden is to satisfy you by the greater weight of the credible evidence, to a reasonable certainty, that "yes" should be your answer to the verdict questions. The greater weight of the credible evidence means that the evidence in favor of a "yes" answer has more convincing power than the evidence opposed to it. Credible evidence means evidence you believe in light of reason and common sense. "Reasonable certainty" means that you are persuaded based upon a rational consideration of the evidence. Absolute certainty is not required, but a guess is not enough to meet the burden of proof.

Sarah to surgery between 7:00 a.m. and approximately 2:45 p.m. caused additional, progressive death of her small bowel." They rely on the testimony of Dr. Dvorak, who stated that "had the diagnosis been suspected even by the surgeons earlier, there may have been a different result." They insist, without citation to the record, that "Balint . . . had opined in her deposition that the 'point of no return' for Sarah probably occurred some time between 10:00 a.m. and noon on March 21." They also maintain that "[e]ven two of the Hegartys' experts, Drs. Quigley and Ament, conceded in depositions that surgery soon after 7:00 a.m. might have led to a different outcome." Dr. Quigley was asked, "do you think that would have been changed, altered if she had gone to the operating room at 7 o'clock, realizing that she would have lost some bowel even at 7 o'clock?" and responded, "I think it's unlikely that she would have died in the immediate postoperative period if she went to the OR at 7:00 a.m." Dr. Ament's response to the question, "If she had gone to surgery at 9:00 or 10:00 in the morning, would she likely have lost less bowel than at 2:30" was "more likely than not." Beauchaine/OHIC claim Dr. Ament "agreed that Sarah's bowel did *not begin to infarct* until 6:00 a.m. on March 21 and then 'infarcted over the next six hours or so or seven hours or so before they finally got her in surgery.' " Beauchaine/OHIC also cite Dr. Schmidt's report and claim that it "explained why Zimmer's belated assessment of Sarah's condition, and particularly Zimmer's failure to diagnose a surgical abdomen, was highly relevant to *any* assessment of Beauchaine's alleged negligence."

¶ 162. On this basis they contend that the jury should have been allowed to compare the conduct of Dr. Beauchaine with that of more senior medical personnel because when they assumed control of Sarah's care

after arriving on March 21, "those same physicians also misdiagnosed Sarah's condition and *continued the same course of treatment*" (emphasis in brief). They conclude that precluding the jury from even considering the post-7:00 a.m. conduct of Drs. Zimmer, Puetz and Balint affected the outcome of this trial by determining that no conduct occurring after 7:00 a.m. was causal, no matter how negligent.

¶ 163. The Hegartys respond that the trial court properly excluded evidence of negligence after 7:00 a.m. because there was no expert testimony that any negligence after 7:00 a.m. was causal, and Beauchaine/OHIC's argument was based on "speculative opinions of possibilities that contradicted their own experts' opinions on causation." They refer to the testimony of Dr. Beauchaine's own experts, Drs. Nichols and Bishop. Dr. Nichols testified that Sarah's bowel was already dead "at the time of the ER admission." At a deposition, Dr. Bishop answered "Yes, approximately" when asked whether "the horse was out of the barn and the damage was basically done and irreversible after approximately 6 a.m. on March 21, 1996."

¶ 164. Disagreeing with Beauchaine/OHIC's interpretations of the depositions of Drs. Balint and Dvorak and the Hegartys' experts Drs. Quigley and Ament, the Hegartys maintain that Beauchaine/OHIC mischaracterize the statements "[i]n a desperate attempt to create an appellate issue where none exists." They explain that, contrary to Beauchaine/OHIC's assertion, "Balint testified only that it was probable that infarction occurred between 10 a.m. and noon" and maintain that the fact "[t]hat infarction may have occurred at this time did not alter the outcome because the damage was already irreversible by then." They note that, as Beauchaine/OHIC admit, Dr. Dvorak, who

was not called at trial, would have testified merely that had the surgery been performed in the morning, it "might have altered the outcome." They note that the portion of Dr. Quigley's deposition that they cite indicated only that it was unlikely that Sarah would have died immediately after the surgery had she gone into surgery at 7:00 a.m., and that Beauchaine/OHIC ignore the next page of the disposition where Dr. Quigley stated that by 6:00 a.m., it was probably too late to save Sarah. The Hegartys also disagree with Beauchaine/OHIC's contention that the jury was not allowed to consider the fact that other doctors reached the same conclusion after 7:00 a.m. as Dr. Beauchaine did before 7:00 a.m., and note that "[t]he jury did hear such evidence." They point to Dr. Schmidt's and Dr. Ament's testimonies, and observe that they both testified about the diagnoses of other physicians after 7:00 a.m., specifically Drs. Zimmer, Puetz and Balint, and that they all failed to correctly diagnose Sarah.

¶ 165. The Hegartys therefore conclude that the trial court "struck the proper balance," and that a different ruling "would create a significant danger that the jury would be misled into believing it would base liability on acts of negligence occurring after 6 a.m., even without causation testimony linking such conduct to Sarah's injuries."

¶ 166. We cannot agree with Beauchaine/OHIC. We are instead persuaded by the Hegartys' contention that what Beauchaine/OHIC are seeking to do is, in fact, create an appellate issue where none exists. Beauchaine/OHIC's entire arguments seem to sidestep the central issue of causation, seemingly arguing that the jury was unjustifiably in the dark about what went on after 7:00 a.m. *See Ollman*, 178 Wis. 2d at 667. They cite testimony by numerous witnesses in an apparent

attempt to show negligence, but do not get more certain than testimony couched in terms of "might have been different" and "more likely than not." Apparently misled by their erroneous assumption that proving the possibility rather than a probability of negligence was sufficient, such statements may suggest negligence; however, they do not indicate the probability of negligence. Most significantly, they do not indicate that the alleged negligence *caused* Sarah's injuries and ultimately death.

¶ 167. The trial court's ruling excluding evidence of negligence after 7:00 a.m. was based on lack of causation. In other words, the events that took place prior to the time after which Sarah's fatal injuries could no longer have been avoided, were causal. All six experts agreed that the cutoff was no later than 7:00 a.m. In light of this clear expert testimony, the trial court did not err in excluding evidence of negligence after 7:00 a.m as non-causal.

¶ 168. For this reason, OHIC/Beauchaine's argument that the jury should have been allowed to compare the conduct of Dr. Beauchaine with that of senior medical personnel, who assumed control after 7:00 a.m. and continued the same course of treatment, is irrelevant. The trial court did not err in excluding evidence of possible negligence after 7:00 a.m. on March 21, 1996.

b. *Evidence Regarding the Causal Negligence of Sarah's Physicians Prior to March 20, 1996*

¶ 169. Beauchaine/OHIC contend that the trial court erroneously excluded evidence regarding the alleged causal negligence of physicians who treated Sarah prior to March 20, 1996.

¶ 170. In July 1995, Sarah was in Indianapolis where she was hospitalized with severe abdominal pain and treated by Dr. Jensen and Dr. McDonnell. Approximately one month before Sarah was hospitalized on March 20, 1996, Dr. Brown, a gastroenterologist, and Dr. Zimmer, Sarah's pediatrician, treated Sarah for abdominal pain.

¶ 171. During trial, the Hegartys moved to exclude evidence of negligence prior to March 20, 1996 as too remote to be causal. On October 14, 2004, the trial court granted the motion, stating that "the issues are what happened on March 20th and into the morning of March 21st," and that anything before that time is "too remote as to the causation here." In making its ruling, the court stated:

> [T]he defense ... has been bringing out this issue about what went on before. And it's very interesting, and it may be allowed and shown that Dr. Beauchaine had difficulties diagnosing this even though there were different circumstances than these other doctors because these other doctors had difficulty diagnosing this before and after. So that's interesting and relevant as to her culpability.
>
> The other physicians may be negligent, but it is too remote as to the causation here. So I can tell you right now it's my anticipation that none of these doctors will be on the verdict before and none of the doctors after. So we're going to zero in.
>
> . . . .
>
> Now, that's not to say ... that I will stop all the testimony about what happened because it may be interesting as to the other theory, that other line of defense that this was tough to diagnose. But ... whether an expert says they were negligent is very

interesting, but it is not causal to the issue at hand. . . .
[T]he issues are what happened on March 20th and into
the morning on March 21st.

So if that gives you any guide as to objection as to
how you present your testimony . . . .

¶ 172. In motions after verdict, Beauchaine/OHIC
asserted that the trial court erred in precluding evi-
dence regarding Drs. Jensen, McDonell, Brown and
Zimmer. The court disagreed and reiterated:

I think it is very clear in the transcript why I did it. . . .
I did indicate it was relevant as to the difficulty of
diagnosing that Beauchaine might have in making the
diagnosis just like these other parties. Dr. Brown, Dr.
Zimmer had problems making the proper diagnosis, as
Dr. Stremski did, as some doctors after the fact did. But
it surely has no causal connection to what happened on
the date in question, the time in question, this particu-
lar episode. And to drag them in and to drag anybody
who may have seen her, might have found out some-
thing, if she would have had the problem when she was
in Indianapolis or with Dr. Brown, then that would be
that lawsuit. We have a different lawsuit here.

¶ 173. Beauchaine/OHIC now claim that the trial
court erred in excluding evidence of negligence prior to
March 20, 1996, as not causal, alleging that the record
"was replete with evidence that actions taken by nu-
merous physicians before that date were a substantial
factor in causing Sarah's injuries." She first points to Dr.
Ament's testimony regarding the care of Dr. Jensen and
Dr. McDonnell in July 1995, according to which Dr.
Jensen and Dr. McDonnell were negligent in not telling
Sarah's parents that Sarah's condition was potentially
serious. They assert that Dr. Ament "unequivocally
testified that Brown failed to evaluate Sarah appropri-

168

ately, resulting in an incorrect diagnosis, and that this negligence was a legal cause of Sarah's injuries and death." They also refer to the testimony of Dr. Bishop, whose testimony regarding Dr. Brown they claim supported that of Dr. Ament. They also point to the excluded testimony of Dr. Schmidt, an expert witness for the defense, who would also have testified that Dr. Brown's care was negligent. They further claim that "the evidence was uncontroverted that Stremski relied heavily on the other physicians' pre-March 1996 conclusions that Sarah's problems were simply chronic constipation."

¶ 174. Based on the above, Beauchaine/OHIC argue that "by excluding the negligent conduct of the physicians who treated Sarah prior to March 20, 1996, the court eviscerated a key theory of defense – that Beauchaine's failure to diagnose Sarah's condition was not negligent because several more experienced physicians, including specialists and physicians who treated Sarah on a repeated basis, also failed to make that diagnosis." They thus insist that there is a "real possibility that the outcome of this case would have been different had the causal responsibility for the Indianapolis doctors, Brown, and Zimmer been placed on the verdict."[37]

¶ 175. The Hegartys respond that evidence of negligence before March 20, 1996, was properly ex-

---

[37] In their reply brief, Beauchaine/OHIC appear to adopt the assumption advanced in their brief-in-chief with respect to their argument that the trial court erred in excluding evidence of negligence after 7:00 a.m., namely, that they, as the defendants, needed not prove any of their allegations to the level of probability, but merely to the level of possibility. As already explained in section, B.3.a, probability, not possibility, is the correct standard.

cluded because the involvement of the Indianapolis doctors and Dr. Brown was too remote to be causal, and there was no expert testimony establishing their causal negligence for purposes of their inclusion on the verdict.

¶ 176. They explain that the main issue was Sarah's admission to Children's on March 20, 1996, with symptoms of bowel obstruction, yet Beauchaine/OHIC "cite the involvement of doctors from Indianapolis eight months prior and the involvement of Dr. Brown, one month prior to March 20, 1996, making general references to evidence of negligence by these doctors that was 'a legal cause' of Sarah's injuries and death." They add that Beauchaine/OHIC's reference to Dr. Brown being causally negligent is contrary to Beauchaine's answers to interrogatories, and that their claim that Dr. Ament "unequivocally" testified that Dr. Brown's negligence was "a legal cause" of Sarah's injuries and death is factually inaccurate because Dr. Ament testified only that Dr. Brown departed from the acceptable standard of practice, and that her references to Drs. Bishop and Schmidt are also not accurate. They also argue that Beauchaine/OHIC's reference to Dr. Ament's testimony that if the physicians in Indianapolis had properly evaluated Sarah in July 1995, an appropriate procedure could have been performed and the events of March 20–21 would have been avoided, does not meet the causation standard, likening it to "permitting a jury in an automobile accident case to assess a driver's negligent speed ten miles before the accident."

¶ 177. We again cannot agree with Beauchaine/OHIC. As with their argument regarding negligence after 7:00 a.m. on March 21, 1996, Beauchaine/OHIC do not appear to fully appreciate the causation standard.

*See Ollman*, 178 Wis. 2d at 667. They cite bits and pieces of testimony in an apparent attempt to convince us that the conduct of physicians other than Dr. Beauchaine was negligent. They do not, however, explain how any of these references to potential negligence purportedly satisfy the standard of having caused Sarah's injuries. Most critically, as the trial court and the Hegartys recognized, and as Beauchaine/OHIC apparently do not, whether or not Dr. Brown, who treated Sarah a month earlier, or Drs. Jensen and McDonnell, who treated Sarah eight months earlier, were negligent, is irrelevant, because the treatments of those doctors have no causal connection to what happened on March 20–21, 1996, the time the experts agreed, Sarah's ultimately fatal injuries could have been prevented.

¶ 178. To further illustrate case law on this point is instructive. Perhaps the best comparison can be found in a case by the Virginia Supreme Court, cited by the Hegartys, *Bryan v. Burt*, 486 S.E.2d 536 (Va. 1997). In *Bryan*, where, like here, a patient complaining of abdominal pain was misdiagnosed, a claim of negligence was brought against the family physician, based on the assertion that he should have communicated more of the patient's history to the emergency room doctors. *Id.* at 537. The court concluded that even if the physician had been negligent in his treatment, because the doctor was never "afforded the opportunity to see, diagnose, or treat the decedent on the [day she was taken to the emergency room]," it was "too remote as a matter of law to be causally related to the decedent's death."[38] *Id.* at

---

[38] Beauchaine/OHIC's reply brief seeks to distinguish *Bryan v. Burt*, 486 S.E.2d 536 (Va. 1997), on the facts, claiming that there the decedent's family doctor was not in the office to take calls on the date of the incident and did not treat the decedent while or after exhibiting symptoms, while here, the

540. Similarly, because the Indianapolis physicians and Dr. Brown were not present when Sarah was brought to Children's on March 20, 1996, one month in the case of Drs. Brown and Zimmer, and eight months in the case of Drs. Jensen and McDonnell, are too remote to be causal.

¶ 179.　Moreover, as the trial court clearly noted, both in explaining the ruling during trial and in motions after verdict, making the proper diagnosis was difficult not only for Dr. Beauchaine, but also for a number of doctors who saw Sarah, and the court thus did allow evidence to that effect from before March 20, 1996. That, however, is not to be equated with causal negligence.

¶ 180.　For these reasons, we cannot agree that the trial court's ruling "eviscerated a key theory of defense" for Beauchaine/OHIC. Faced with a lack of evidence showing causation, the trial court properly ruled evidence of negligence prior to March 20, 1996, inadmissible.

### c. Exclusion and Limiting of Witness Testimony

¶ 181.　Beauchaine/OHIC contend that the trial court erroneously excluded testimony of Drs. Lewis and Kalt and limited the testimony of Dr. Schmidt.

### i. Dr. Lewis

¶ 182.　Beauchaine/OHIC contend that the trial court erroneously exercised its discretion in excluding Dr. Lewis's deposition testimony.

---

Indianapolis physicians and Dr. Brown treated Sarah during an episode of volvulus. We disagree with this distinction. *Bryan* turned on the fact that the family physician was not present on the day the patient was taken to the emergency room at the start of the incident that led to her death.

¶ 183. Dr. Lewis was the director of the Medical College's graduate education and pediatric residency programs on March 20, 1996, and was deposed in January 2000. He testified about the employment relationship between the residents, the attending physicians, MCWAH, the Medical College, and Children's. In September 2001, Dr. Lewis died. The defense did not include Dr. Lewis on its witness list or indicate in its pretrial report that Dr. Lewis's deposition would be read; instead, the pretrial report specifically stated that they "d[id] not intend to utilize depositions except as required for impeachment in cross-examination."

¶ 184. During trial, Beauchaine/OHIC moved to introduce Dr. Lewis's deposition testimony. The Hegartys argued that they would be unfairly prejudiced by the testimony because Dr. Lewis had not been identified as a witness. The trial court refused to allow the introduction of Dr. Lewis's deposition on grounds that Dr. Lewis's testimony was "not helpful or probative to the ultimate issues this Court will give the jury," and "a waste of this court's time, this jury's time, and divert[s] us from the issues at hand."

¶ 185. Beauchaine/OHIC assert that Dr. Lewis's testimony was "highly relevant" because it clarified the role and involvement of senior residents in admitting and evaluating patients, and should have been admitted under Wis. Stat. § 804.07(1)(c)(1)a.[39] They cite portions of Dr. Lewis's testimony that they find relevant, includ-

---

[39] Wisconsin Stat. § 804.07(1)(c)(1)a. provides:

(1) Use of depositions. At the trial any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

ing: that once admitted, "the senior resident supervising admissions" assigned Sarah to Dr. Beauchaine "and the team she was on"; that "for a patient admitted in the evening, the intern will usually be in contact with two different senior residents"; and that a "first-year resident is required to communicate to the senior admitting resident."

¶ 186. Responding to the Hegartys' argument during trial that Dr. Lewis was not named on the witness list, Beauchaine/OHIC admit that the defense "did not explicitly name Lewis in her witness list," but note that Dr. Beauchaine "expressly reserved the right in her pretrial report to offer additional exhibits, name additional witnesses, mark as exhibits any deposition transcripts referred to or read from at the time of trial, and call any witnesses named by another party," the Hegartys themselves filed Dr. Lewis's deposition with the court, and Children's pretrial report did identify Dr. Lewis's deposition as testimony to be read in. They consequently disagree that reading Dr. Lewis's testimony could have been a surprise or prejudicial. They also disagree that the deposition was cumulative, and claim that it provided critical details about control and supervision that were not elicited from other sources, adding that it rebutted "Hagen's [(the senior resident on duty the night Sarah was admitted)] self-serving denials of her involvement in Sarah's case." They thus conclude that "[h]ad the jury been permitted to consider Beauchaine's role in full context, it likely would not have been so hard on her."

. . . .

(c)1. The deposition of a witness other than a medical expert, whether or not a party, may be used by any party for any purpose if the court finds any of the following:

a. That the witness is dead.

¶ 187. The Hegartys respond that the defense not only violated the scheduling order by not identifying Dr. Lewis in their witness list and pretrial report, but also failed to designate Dr. Lewis's deposition to be read into evidence at trial, adding that Beauchaine/OHIC's claim that the defense reserved the right to add witnesses renders the pretrial report meaningless and ignores the fact that their experts were gone when she attempted to introduce it. They also insist that the probative value of Dr. Lewis's general knowledge of the role of senior residents in admitting and evaluating patients is outweighed by the danger of confusing and misleading the jury, as they did not have the ability to cross-examine Dr. Lewis.

¶ 188. We disagree with Beauchaine/OHIC. Their claim that the deposition should not have been excluded because the pretrial report reserved the right to add witnesses and mark as exhibits depositions referred to or read from at trial entirely defeats the very purpose of the witness list requirement. The problem of allowing such a late addition is compounded by the fact that Dr. Beauchaine did not seek to have the deposition read until midway through trial, at a time when the Hegartys' experts had already left, making it far too late for them to be called back to respond to the contents of the deposition. Aside from the issues already discussed, the obvious problem of the Hegartys not being able to cross-examine Dr. Lewis remains.

¶ 189. As far as the deposition purportedly clarifying the role of senior residents and providing evidence that Dr. Hagen, despite her denials, was involved in Sarah's case, we are unsure how Beauchaine/OHIC believe the deposition would have rebutted Dr. Hagen's testimony, given that Dr. Lewis's deposition does not

mention Dr. Hagen. It seems that the deposition would have provided little more than non-specific statements about the residents and the general interplay between the various institutions which, as the trial court already concluded, would have further dragged out an already long trial. For these reasons, we are satisfied that the trial court properly excluded Lewis's deposition.

### ii. Dr. Kalt

¶ 190. Beauchaine/OHIC contend that the trial court erroneously exercised its discretion in excluding Dr. Kalt's testimony.

¶ 191. Dr. Melissa Kalt was a third-year resident who, on March 21, 1996, was on the same team as Dr. Karen Zorek and Dr. Beauchaine. Dr. Kalt saw Sarah on March 21, 1996, at 7:30 a.m. On October 1, 2004, Dr. Beauchaine subpoenaed Dr. Kalt, but did not indicate an intention to call her as a witness. At trial, Dr. Hagen and Dr. Zorek testified for the Hegartys. Both Dr. Hagen and Dr. Zorek gave testimony suggesting that Dr. Beauchaine may have altered and falsified Sarah's medical records and not followed the protocol that required the participation of third-years residents, but instead, took sole responsibility for Sarah's care. Dr. Hagen, the third-year resident with whom Dr. Beauchaine should have consulted, specifically denied caring for Sarah. After the testimonies of Dr. Hagen and Dr. Zorek, Dr. Beauchaine sought to introduce Dr. Kalt's testimony to rebut Dr. Hagen's and Dr. Zorek's testimonies. The court denied the motion, on grounds that it violated the scheduling order, was an unfair surprise in the middle of the trial for which the other parties were not on notice, and was not probative enough to overcome the prejudice to the other parties. The court explained:

> Did the parties believe Kalt would be called? No, they were never put on notice.

176

I'm told now that on October 1st, Beauchaine . . . said "You know, we might want to use this person." Nobody was told, including the Court . . . .

So is there unfair prejudice? There's surprise on the parties, there's surprise on the Court, there's a surprise on the system . . . . Why wait until the middle of trial to spring this. It may be rebuttal on a theory, one potential theory, but we cannot and will not condone trial by surprise or ambush. I cannot allow that.

If we look at the record here, as I indicated before Defendant Beauchaine failed to name experts in a timely manner per the scheduling order. She was given the grace of the Court to allow them to do that. . . .

Now we have Dr. Beauchaine again offering a witness at this late date. "Well, it's rebuttal. She was generally named in the record and they should have known." . . . .

Dr. Beauchaine would have and should have called it to the Court's attention earlier at the time of naming witness, interrogatories, wherever it could happened to be in the record, and I guess at a minimum, October 1 . . . .

. . . .

Beauchaine listed her witnesses. Kalt was not named. This is a violation of the scheduling order.

[W]hen . . . we look at the probative value of this witness . . . . How reliable is this if we're going to weigh it? . . . The weight of that testimony is really suspect.

So the probative value, when we look at that, is very suspect. And surely, the prejudice to the parties to this case outweighs the probative value of that.[40]

---

[40] Beauchaine/OHIC also argue that the trial court applied the incorrect legal standard in applying the balancing test of

(Footnote added.) The court denied Beauchaine/OHIC's motion after verdict on this issue.

¶ 192. WISCONSIN STAT. § 904.03 sets forth the balancing test for admitting or excluding evidence whereby a court compares the probative value of the evidence to its prejudicial effect.

¶ 193. Beauchaine/OHIC assert that the "explosive and highly prejudicial" testimonies of Dr. Hagen and Dr. Zorek made Dr. Kalt's proffered rebuttal testimony "necessary" because it "would have established that Hagen . . . was indeed involved in Sarah's admission." In particular, Beauchaine/OHIC contend that Dr. Kalt would have directly contradicted Dr. Hagen's testimony by establishing that Dr. Beauchaine was acting under the supervision of Dr. Hagen, and rebutted the suggestions that Dr. Beauchaine doctored records.

¶ 194. Second, Beauchaine/OHIC contend that although Dr. Kalt was not named on their witness list, she was identified generically by both the defense and the Hegartys in at least three ways: (1) As a participant in Sarah's treatment she fell under the defense's catchall category of "any and all medical or nursing staff at Children's Hospital . . . who provided care for Sarah"; (2) as a third-year medical student at the Medical College she fell under the Hegartys' witness list's catchall of "[a]ll parties to this lawsuit including their agents and/or employees"; and (3) under the defense's category

---

WIS. STAT. § 904.03—probative value versus unfair prejudice—to conclude that Dr. Kalt would not be allowed to testify, calling this "exclusion of a witness" an "extreme sanction." We disagree. The court applied the proper legal standard. Claiming that a witness was "excluded" confuses the issues because she was never named as a witness to begin with. Not allowing the last-minute addition was not an "extreme sanction."

of "any and all witnesses" named by "Plaintiffs" and "any co-defendant." They therefore assert that the Hegartys were on notice that Dr. Kalt was a potential witness and that Dr. Kalt's identity was known by the Hegartys, as she was identified in Sarah's medical records and in Dr. Beauchaine's 1999 deposition. They nonetheless proclaim that "[r]egardless, Beauchaine had an absolute right on rebuttal to address the plaintiff's new 'evidence.'" They conclude that because the probative value of Dr. Kalt's testimony clearly outweighed any prejudice to the Hegartys, the exclusion of Dr. Kalt's testimony resulted in an error that was not harmless.

¶ 195. The Hegartys insist that the court properly excluded Dr. Kalt's testimony because it violated the scheduling order. They disagree that Dr. Kalt fits under any of the three catchall provisions, and note that Dr. Beauchaine did not disclose Dr. Kalt as a potential witness in response to interrogatories that sought to identify other doctors or students who saw or examined Sarah and individuals with whom Dr. Beauchaine discussed Sarah's care on March 20–21, 1996. The Hegartys contend that the references to Dr. Kalt in the medical records and in Dr. Beauchaine's deposition "[r]ather than excusing their failure, this only raises more questions as to why [B]eauchaine did not properly name Kalt." They call Beauchaine/OHIC's assertion that Dr. Kalt's testimony was necessary "ironic" because both Dr. Zorek and Dr. Hagen were named on the defense's witness list and "[t]hus any claimed surprise results from [B]eauchaine's failure to anticipate their own witnesses' testimony!"

¶ 196. By contrast, the Hegartys maintain that calling Dr. Kalt as a witness did come as a surprise to them, the other parties and the court, and that its weight was "really suspect," resulting in unfair preju-

dice that would have outweighed the probative value of the testimony. They submit that the record refutes Beauchaine/OHIC's "belated attempt to place Kalt in Sarah's room" because Dr. Beauchaine's deposition testimony indicated she was the only physician who examined Sarah from 8:00 p.m. on March 20th until 7:30 a.m. the next morning, and that she did not see Dr. Kalt perform a physical exam on Sarah the morning of March 21. They also point to Dr. Beauchaine's trial testimony where she testified that she had no memory of Dr. Kalt being in the room, as well as Nurse Gutierrez's and Sarah's mother's testimony that Dr. Kalt was not in the room.

¶ 197. We again disagree with Beauchaine/OHIC. Their attempt to call Dr. Kalt was undoubtedly belated and in violation of the scheduling order. We cannot agree that she should be seen as fitting under the three catch-all provisions they listed, and that those provisions are enough to give notice that Dr. Kalt might be called later. As was the case with Dr. Lewis's deposition, generic references like "any and all medical staff" and "all parties to the lawsuit, including their agents and/or employees," hardly serve the purpose of the scheduling order. The Hegartys had a right to rely on the interrogatories. We disagree that Dr. Kalt's testimony would not have come as a surprise to the Hegartys and that the Hegartys were on notice by virtue of the fact that Dr. Kalt's name appeared in the medical records.

¶ 198. With respect to Beauchaine/OHIC's assertion that the testimony was nonetheless "necessary," it does appear suspicious that Beauchaine/OHIC now allege that they were unaware of what Dr. Hagen and Dr. Zorek would testify to, given that both Dr. Hagen

and Dr. Zorek were named on the defense's own witness list. We also agree with the trial court and the Hegartys that the weight of Dr. Kalt's testimony appears questionable in light of conflicting evidence from Dr. Beauchaine's own deposition and trial testimony, as well as the testimony of Sarah's mother and the nurse on duty, all of which indicated that Dr. Kalt never saw Sarah. The trial court was well within its discretion in concluding that the prejudice to the Hegartys outweighed any probative value Dr. Kalt's testimony might have had.

¶ 199. We are satisfied that the trial court did not err in refusing to allow Dr. Kalt to be added as a witness.

### iii. Dr. Schmidt

¶ 200. Beauchaine/OHIC contend that the trial court erroneously exercised its discretion in limiting the expert testimony of Dr. Schmidt.

¶ 201. Dr. Emmett Schmidt, the Director of the Pediatric Residency Program at Massachusetts General Hospital and Harvard Medical School, was called as a defense witness. On April 27, 2004, Dr. Schmidt had issued an expert report regarding Dr. Beauchaine's fulfillment of standards of care expected from first-year residents training in pediatric medicine.

¶ 202. On the last day of trial, Dr. Beauchaine sought to call Dr. Schmidt as a witness. The trial court ruled that Dr. Schmidt could provide testimony concerning the standard used at Harvard, but could not comment on the standard used at Children's or the Medical College, stating:

> I think what can happen – and this expert can be put on – for educating this jury about what they do at Harvard, but what he thinks about what they did at Children's or at [the Medical College] is irrelevant . . . . If he wants to

say "Here is what we do at Harvard. We have the first-year resident and we have the third-years resident," fine . . . . Accordingly, I suggest that you keep him to general comments as an expert [about] what they do at Harvard. It might be very interesting and the jury can compare that to what they did here, and they may have some feelings about it, but I'm not going to allow him as an expert to say . . . – all of a sudden this system is wrong . . . .

¶ 203. Dr. Schmidt ultimately gave a testamentary offer of proof with respect to his opinions regarding the standard of care about which he was not allowed to testify. In that testamentary offer of proof, Dr. Schmidt opined that Drs. Jensen and McDonald in Indianapolis were negligent for failure to perform an exploratory surgery that would have identified and repaired Sarah's volvulus and prevented Sarah from dying when she did. Dr. Schmidt opined that Dr. Brown was negligent for failing to refer Sarah to a surgeon for surgical exploration that would have given a greater than 51% chance that Sarah's volvulus would have been identified and repaired and led to Sarah not dying when she did. Dr. Schmidt also opined that on March 20, 1996, the admitting third-year resident had an independent duty and responsibility to personally examine and evaluate Sarah, and the failure to do so constituted care that fell below acceptable standards. Finally, Dr. Schmidt opined that if the admitting third-year resident participated in Sarah's treatment and acquiesced in the treatment plan, that was a departure from the standard of care, and that a procedure that requires the input of first-year residents before a third-year resident becomes involved in the care is not an acceptable procedure.[41]

---

[41] Although Beauchaine/OHIC recognize the correct standard for the admissibility of expert testimony, their argument

¶ 204. Beauchaine/OHIC contend that in refusing to allow Dr. Schmidt to testify as to his opinion regarding the standard of care at Children's or the Medical College, the court "gutted the heart of Schmidt's testimony." They point to the fact that the court allowed Drs. Ament and Morris, who testified for the Hegartys, to state that Dr. Beauchaine failed to meet the standard of care for an unlicensed first-year intern, despite "lesser expertise on the duties and standards required or residency programs throughout the country." They contend that had Dr. Schmidt been allowed to testify, his testimony would have assisted the jury in understanding the medical residency program at Children's and the roles of all the residents involved in Sarah's care and treatment. They also believe Dr. Schmidt's opinions were "critical" given the contentions that she was "a 'rogue' first-year resident acting on her own and without senior resident supervision," concluding that the real controversy as to comparative fault was not tried.

¶ 205. The Hegartys disagree. They first submit that at no time, prior to the last day of trial was there an issue regarding causal negligence by third-year residents, Children's or the Medical College. They reference an interrogatory where Dr. Beauchaine was

section includes the sentence "the court applied the erroneous standard in order to exclude Schmidt's testimony" following the assertion that "the court's ruling precluded Schmidt from rendering any opinions critical to the Medical College/Children's including the applicable standard of care." Because it is unclear what Beauchaine/OHIC mean by an erroneous standard, since they neither explain what it is nor suggest a correct one, and, in fact, reference the proper one, we cannot address this portion of their argument. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (undeveloped arguments will not be addressed).

183

asked whether agents or employees of Children's and the Medical College were causally negligent with regard to Sarah's care, and she responded that she did not contend that anyone was. They also refer to a discovery response where Dr. Beauchaine stated that she had no knowledge, information, or belief that any third party failed to meet the standard of care or was causally negligent.

¶ 206. While acknowledging Dr. Schmidt's report, they discount it, stating that "it had no factual basis for the opinion that Children's was negligent and expressed no opinion that third-year residents or [the Medical College] were negligent or that any negligence was causal," and as such, insist that Beauchaine/OHIC failed to produce an expert report suggesting that a third-year resident, Children's or the Medical College were causally negligent. For these reasons, they submit that allowing the introduction of "this new 'issue' on the last day of trial after all of plaintiffs' evidence was in and their experts gone would have been highly unfair."

¶ 207. We once again disagree with Beauchaine/ OHIC. As the Hegartys note, not until Dr. Schmidt surfaced on the *last* day of trial had there ever been any allegation that third-year residents had been negligent in their treatment of Sarah. This includes a complete lack of any such mention in Dr. Beauchaine's pleadings, answer, and affirmative defenses. Beauchaine/OHIC also never filed such a cross-claim. In light of the issue not having been previously raised, we are convinced that no error occurred in limiting Dr. Schmidt's testimony in this regard. This conclusion is further supported by Dr. Beauchaine's own interrogatory re-

sponses, which clearly indicated that no other employees of Children's or the Medical College had been causally negligent.[42]

¶ 208. We are also satisfied that it was a proper exercise of discretion on the part of the trial court to limit Dr. Schmidt's testimony to general comments about the standard of care and about residency programs on grounds that it would have implied that a departure from what is done at Harvard renders what occurred here below the standard of care, because Dr. Schmidt's expertise concerned the procedures in place at Harvard, not the procedures in place at Children's. Additionally, as was the case with Dr. Lewis's deposition, because of the very late timing, as the trial court observed, it might have been difficult for the Hegartys to respond to Dr. Schmidt's testimony because all of their experts had already departed. In sum, we discern no error on the part of the trial court.

### d. Dr. Hagen

¶ 209. Beauchaine/OHIC contend that the trial court erroneously permitted Dr. Hagen to offer expert testimony.

¶ 210. During trial, Dr. Hagen was called to testify. She first testified that she did not provide Sarah any medical care, and that she did not discuss Sarah's care with Dr. Beauchaine on March 20 or 21, 1996. She

---

[42] As to the portion of Dr. Schmidt's testamentary offer of proof that indicated that he felt Drs. Jensen, McDonald and Brown were negligent, we have already established in section B.3.b. of this opinion that the trial court did not err in excluding evidence of negligence from before March 20, 1996 as not causal, and hence, any testimony regarding the possible negligence of Drs. Jensen, McDonald and Brown is irrelevant.

also testified that answers to an interrogatory by Dr. Beauchaine, according to which she was a person Dr. Beauchaine "conversed with regarding Sarah Hegarty from 7:45 p.m. on March 20, 1996 until 8:15 a.m. on March 21, 1996," and she and Dr. Beauchaine "examined Sarah together and formulated orders at the time of admission," were untrue. She testified that the conversation mentioned in Dr. Beauchaine's interrogatory response never took place, and that the first time she became aware that a claim had been made that she had been involved in Sarah's care was when she was contacted to give a deposition.

¶ 211. Counsel for the Hegartys then presented Dr. Hagen with several hypothetical situations based on Sarah's medical records and asked Dr. Hagen what she would have done had she been treating Sarah. Dr. Hagen's responses included that the results of a rectal examination done at 9:00 p.m. on March 20, 1996, were inconsistent with chronic constipation, and that additional tests should have been done. She also testified that particularly in light of Sarah's history of abdominal pain and the fact that the measures that had been attempted had not resolved the problem, her condition was inconsistent with the chronic constipation diagnosis. The defense, on multiple occasions, objected to the questions on grounds that they were expert questions, and Dr. Hagen was listed as a fact witness. The court overruled the objections, stating that as a doctor, she can answer them.

¶ 212. Two days later, the court agreed that some of the Hegartys' counsel's questions had "call[ed] for [Dr. Hagen] to analyze what was done and act as an expert," and that "at least in this area, it is somewhat prejudicial." The court added, however, that "it is very

186

curable" and "not so drastic in the greater scheme of things," and issued the following curative instruction:

> There was one witness that testified, I think Dr. Hagen, and there was some objection about some of her testimony. I'm not going to go into what it was, but I basically let some of it in because she was a doctor . . . there was some questions asked of her to talk about Dr. Beauchaine's activity.
>
> She wasn't called as an expert, she was called as a fact witness, okay? So if she made any statements that may have inferred that Dr. Beauchaine was below the standard of care, she wasn't called for that and you're to disregard that. She was called as a fact witness. She was asked some questions about what she might have done, but if there's any inferences to that effect, disregard it because they're stricken from the record.

¶ 213. Beauchaine/OHIC contend that the trial court erred in admitting Dr. Hagen's testimony, calling it " 'opinion' testimony going to the heart of the case" and "self-serving and highly prejudicial speculation which did not even rise to the level of 'lay opinion.' " Referring to Dr. Hagen as a "surprise witness," Beauchaine/OHIC maintain, citing *Johnson v. Seipel*, 152 Wis. 2d 636, 652, 449 N.W.2d 66 (Ct. App. 1989), that the defense "had no way of knowing that the Hegartys would use Hagen to elicit expert opinion," and that therefore, its probative value was outweighed by the prejudice to the defense. They add that "irreparable damage" was done to Dr. Beauchaine's defense because the curative instruction was not sufficient to "unring the bell" because it did not undo the prejudice and failed to tell the jury what portion it was to disregard.

¶ 214. The Hegartys respond that the trial court properly admitted Dr. Hagen's testimony and eliminated any error with a curative instruction.

¶ 215. First, they contend that Dr. Hagen's testimony was not in fact offered as expert testimony on the standard of care, but rather as "relevant fact testimony and to impeach Beauchaine." As to impeachment, citing Dr. Beauchaine's deposition, in which she testified, "I do not know of any physician who examined her during that time besides myself," they note that at trial Dr. Beauchaine testified, in direct contradiction to her deposition, that she and Dr. Hagen jointly performed a physical of Sarah, and approved the treatment plan. The Hegartys add that, consistent with Dr. Hagen's trial testimony that she did not provide any medical care for Sarah, "[n]owhere in the thousands of pages of medical records is Hagen noted as treating Sarah." They also contend that Beauchaine/OHIC's reference to *Johnson* is unpersuasive because in *Johnson*, the court refused to allow the testimony of a witness who had not been named or deposed and whose testimony would have been cumulative, whereas here, Dr. Hagen was named as a witness, she had been deposed, and her testimony was not cumulative.

¶ 216. Alternatively, the Hegartys submit that any error was cured by the curative instruction. As to Beauchaine/OHIC's claim that the instruction was insufficient, the Hegartys note that they did not object to the wording of the curative instruction, and thus, under *Stunkel v. Price Electric Cooperative*, 229 Wis. 2d 664, 671, 599 N.W.2d 919 (Ct. App. 1999), they waived any objection to the instruction, and that even so, under *In re Commitment of Lombard*, 2003 WI App 163, ¶ 18, 266 Wis. 2d 887, 669 N.W.2d 157, "as long as the overall meaning communicated by the instructions was a correct statement of the law, no grounds for reversal exist."

188

¶ 217. While Dr. Hagen's testimony was fact testimony and in part at least intended to impeach Dr. Beauchaine, we cannot agree that all of her testimony fit under these two categories. As such, we agree with Beauchaine/OHIC that the testimony given by Dr. Hagen overstepped the bounds of that expected from a fact witness when she responded to questions about hypothetical situations based on Sarah's medical records.

■■■■■■■

¶ 218. The trial court acknowledged its error, however, and issued a curative instruction. We assume that the jury followed the instruction. *Williamson*, 84 Wis. 2d at 396. We are unconvinced by Beauchaine/OHIC's insistence that the instruction was insufficient to undo the prejudice and too imprecise to tell the jury what to ignore. The instruction was certainly clear enough to satisfy the standard of communicating the correct facts and law, *Lombard*, 266 Wis. 2d 887, ¶ 18, and, as the Hegartys point out, Beauchaine/OHIC did not object to the instruction at the time it was given and have thus waived any objection to it. *Stunkel*, 229 Wis. 2d at 671.

¶ 219. Because we are satisfied that the curative instruction eliminated the error, our analysis need not go further.

### e. *Beauchaine's Employment File*

¶ 220. Beauchaine/OHIC contend that the trial court erroneously excluded evidence relating to Dr. Beauchaine's employment file.

¶ 221. Dr. Beauchaine's employment file was maintained by the Medical College. Via a request for production of documents dated December 14, 1999, the

Hegartys requested that the Medical College provide, among other things, "[a]ny and all documents relating to employment, control, or supervision with respect to residents at Children's Hospital, including but not limited to Angela Beauchaine, that were in effect in March 1996." The Medical College responded by stating, "[w]e have no such documents." Dr. Lewis was deposed on January 29, 2000, and testified that he had reviewed Dr. Beauchaine's performance generally, but not specific to her treatment of Sarah. In response, the Hegartys made a request for production of those documents. On November 24, 2003, the Medical College produced Dr. Beauchaine's employment file, most of which consisted of documents accumulated after March 1996. A cover letter explained that certain "credentialing" materials were protected and could not be produced. On October 11, 2004, during trial, the Hegartys received a letter from the Medical College that stated that the credentialing materials previously withheld were in fact to be produced pursuant to the Hegartys' request and included copies of three letters of recommendation written by Dr. Lewis on behalf of Dr. Beauchaine dated April 17, 1998, August 27, 2001, and August 29, 2001. The three letters described Dr. Beauchaine as an "outstanding pediatric resident," and while the two letters written in 2001 mentioned that she was named in an ongoing malpractice action, they also stated that the action is "as yet unresolved" and that "[t]o the best of my knowledge there is no evidence that Dr. Beauchaine's conduct was in any way inappropriate or negligent in the care of this patient."

¶ 222. The Hegartys filed a motion *in limine* to preclude the introduction of the letters on grounds of hearsay. Beauchaine/OHIC asserted that while the letters were hearsay, they satisfied the exception for

records of regularly conducted activity under Wis. Stat. § 908.03(6).[43] The trial court found that the letters were hearsay, but disagreed that they met the exception of regularly-conducted activity or any other exception. The court also felt that the letters improperly implied that Dr. Beauchaine had not been negligent in her treatment of Sarah, stating: "There is no real circumstantial guarantee of trustworthiness in this and it invades the province of the jury. It calls for legal conclusions by this person not object to cross examination." The court added that the probative value of the letters was outweighed by their risk of causing prejudice and jury confusion. The court later denied Beauchaine/OHIC's post-verdict motion on this issue.

¶ 223. Beauchaine/OHIC contend that the trial court erred in concluding that the letters do not fall under Wis. Stat. § 908.03(6), and cite *Rollie Johnson Plumbing & Heating Service, Inc. v. Department of Transportation*, 70 Wis. 2d 787, 793, 235 N.W2d 528 (1975), for the proposition that § 908.03(6) "specifically includes opinions, as well as acts, events and conditions, as proper objects of admissible entries under the statute." They also allege that the probative value favored admission because the letters refuted the testimony from the Hegartys' witnesses questioning Dr. Beauchaine's performance and accusing her of violating

---

[43] WISCONSIN STAT. § 908.03 provides in relevant part:

(6) RECORDS OF REGULAR CONDUCTED ACTIVITY. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with s. 909.02(12) or (13), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

procedures. Calling the letters "crucial" to their defense, Beauchaine/OHIC maintain that their exclusion was highly prejudicial because it made Dr. Beauchaine unable to rebut what they call "Hagen and Zorek's highly critical and self-serving testimony to the effect that Beauchaine was an inept rule-breaker who acted independently and refused to comply with established policies."

¶ 224. The Hegartys respond that the court was within its discretion in holding the letters inadmissible. They argue that the letters do not fall under WIS. STAT. § 908.03(6), explaining that it was not "a 'regularly conducted activity' at [the Medical College] to review malpractice lawsuits and author conclusory letters," and that there were not sufficient indications of trustworthiness. They also maintain that the probative value of the letters was substantially outweighed by the danger of misleading the jury, and note, citing *Pucci v. Rausch*, 51 Wis. 2d 513, 519, 187 N.W.2d 138 (1971), that "the opinions expressed by Lewis were not made to a reasonable degree of medical probability."

¶ 225. Once again, we do not find reversible error. We agree in particular with the trial court's conclusion that the letters' probative value was outweighed by their risk of causing prejudice and jury confusion.

¶ 226. As we have seen, the Hegartys first requested the production of documents, including Dr. Beauchaine's employment file, in 1999, but were told that none existed. A second request for documents was made in response to Dr. Lewis's deposition in 2000, when he mentioned having reviewed Dr. Beauchaine's performance. Three and one-half years later, in 2003, the Hegartys received portions of Dr. Beauchaine's employment file, but were informed that certain "cre-

dentialing" documents, including the letters in question, were not included, yet a year later, *in the middle of trial,* the Hegartys were provided copies of the letters, along with an acknowledgement that they were not in fact protected. At this point, Beauchaine/OHIC sought to introduce the newly-disclosed letters of recommendation. The three letters, written in 1998 and 2001, were provided to the Hegartys extremely late, in the middle of trial, long after their request had been made after first being told, in direct contradiction to the subsequent concession, that they were protected and could not be produced. This certainly caused both surprise and prejudice to the Hegartys.

¶ 227. Considering the letters in conjunction with Dr. Lewis's deposition testimony, in which he indicated that he had reviewed Dr. Beauchaine's performance generally, but not specific to her treatment of Sarah, seriously calls into question the reliability of the letters. It is unclear why Dr. Lewis would write letters of recommendation expressing a clear opinion that Dr. Beauchaine's treatment of Sarah was not "in any way inappropriate or negligent" if he had not reviewed Dr. Beauchaine's performance specific to her treatment of Sarah. Of course, as was the case with Dr. Lewis's deposition, due to Dr. Lewis's having died, cross-examination was not an option to verify or question the contents of the letters. Because the implication in the letters that Dr. Beauchaine's treatment was not negligent unquestionably would have improperly suggested to the jury that Dr. Beauchaine in fact was not negligent in her treatment of Sarah, the risk of jury confusion from the admission of the letters would have been great.

¶ 228. We are satisfied that the court properly excluded the letters of recommendation as unduly

193

prejudicial and confusing. We therefore need not address whether the letters were records of regularly conducted activity. *Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to address non-dispositive issues).

### f. Exclusion of the Medical College from Special Verdict Form

¶ 229. Beauchaine/OHIC contend that the trial court erroneously excluded the Medical College from the special verdict form.

¶ 230. The Hegartys provided Dr. Beauchaine with an interrogatory and request for admissions dated October 1, 2002, which included the question:

> Do you contend that any of the persons or entities, named in the above Request for Admission, [which included the Medical College,] individually or through their agents or employees, were negligent under the applicable standard of care, by commission or omission, in the care or treatment that they provided or failed to provide to Sarah Hegarty at any time between 7/28/95 and 11:00 a.m. on 3/2/96?

Dr. Beauchaine's response, dated October 6, 2002, was: "Not at this time based on the information available to date."

¶ 231. During trial, after the close of evidence, when Beauchaine/OHIC submitted their proposed special verdict form, it included a question that read, "Was the Medical College of Wisconsin, through its employees and/or agents, negligent with respect to the care and treatment provided to Sarah Hegarty?" In court, however, counsel for Dr. Beauchaine changed his mind and stated that rather than via vicarious liability, the Medical College should be on the verdict for negligent training/supervision:

The Medical College of Wisconsin should be on the verdict, but I would concur with [counsel for the Hegartys] I don't believe that vicarious liability the way we have submitted the instruction to the Court, [but] it is with regard to the negligence in the supervision training and/or hiring with regard to the operation of the pediatric residency program.

¶ 232. The trial court denied the request and stated:

I think the facts are clear. She works, many of these parties work for the Medical College of Wisconsin, and . . . some of them are put into the hospital through affiliated hospitals. But I think both of them are irrelevant. And I think it is a double kick at the cat . . . . So no question on the verdict as to the Medical College of Wisconsin, or instructions thereof, whether they are vicariously or otherwise liable.

¶ 233. In denying Beauchaine/OHIC's post-verdict motion seeking a new trial on grounds that the court had misapplied the law by not including the Medical College on the verdict, the court explained that "even [in] Beauchaine's testimony earlier she admitted that the Medical College of Wisconsin was not negligent, and that that was never an issue I think until there was a shifting of defenses . . . ."

¶ 234. Beauchaine/OHIC contend that the trial court's ruling denying its request for a new trial in its post-verdict motion constitutes reversible error and that the trial court erroneously called it a "double kick at the cat."[44] Citing *Connar v. West Shore Equipment of Milwaukee, Inc.*, 68 Wis. 2d 42, 45, 227 N.W.2d 660

[44] Beauchaine/OHIC state that they "submitted proposed jury instructions and a proposed verdict including [the Medical College] based on its negligent supervision of Beauchaine." This

195

(1975), they argue that "[the Medical College] was required to be on the verdict if there was any 'evidence of conduct which, if believed by the jury, would constitute negligence' by [the Medical College]," and that "[t]he fact that [the Medical College] settled with the Hegartys was immaterial: 'the apportionment must include all whose negligence may have contributed to the arising of the cause of action.'" They also cite *Langhoff v. Milwaukee Prairie du Chien Railway Co.*, 19 Wis. 489, 497 (1865), for the proposition that "[a] trial court may exclude a person or entity from the verdict only if there was 'an entire absence of evidence' tending to establish their negligence.'" They thus assert that under *Connar* and *Langhoff*, in a comparative negligence case, the jury must be given an opportunity to compare the negligence of all persons involved.

¶ 235. Based on the above, Beauchaine/OHIC maintain that the record was "replete" with evidence of the Medical College's negligence because Drs. Zorek, Hagen, and Beauchaine testified that they were under the supervision of the Medical College employees Drs. Lewis and Zimmer. Beauchaine/OHIC further assert that even under the Hegartys' theory, the Medical College should have been included, claiming that both the Hegartys and MCWAH presented evidence, specifically, the testimonies by Drs. Zorek and Hagen, suggesting that Dr. Beauchaine's failure to follow the Medical College's policies resulted in Sarah's death. Under this

---

claim is simply incorrect. As we have seen, counsel for Dr. Beauchaine submitted proposed instructions based on vicarious liability, and then, in court, apparently in response to the arguments by the Hegartys' counsel that there was no evidence suggesting that the Medical College was vicariously liable, changed their mind and switched to arguing for a verdict question inquiring about negligent supervision.

scenario, the argument goes, "the question becomes whether the Medical College was negligent in training and supervising residents," and hence, "[i]f it was known that residents failed to follow established policy and practice . . . and that such actions resulted in patients not receiving care from licensed physicians, [the Medical College] had a supervisory duty to address and remedy the situation." They thus insist that the trial court's ruling prevented Dr. Beauchaine from defending herself.

¶ 236. The Hegartys respond that Beauchaine/ OHIC waived the issue because they failed to raise the Medical College's alleged negligence in the answer and did not make a cross-claim against the Medical College.

¶ 237. They also agree with the trial court's refusal to include the question on the special verdict based on Beauchaine/OHIC's failure to amend the pretrial interrogatory response, and because the question would have been cumulative. As to the 2002 interrogatory in which Dr. Beauchaine denied that the Medical College "individually or through their agents or employees w[as] negligent," they believe the court was well within its discretion under WIS. STAT. § 804.12(2) in refusing to allow Dr. Beauchaine to take an inconsistent position at trial. As to the question being cumulative, explaining that since the verdict inquired about the negligence of Drs. Zimmer and Hagen, who Beauchaine/OHIC alleged were responsible for supervising Dr. Beauchaine, to the extent that the jury agreed with them, the Hegartys believe it would have given Beauchaine/OHIC "two kicks at the cat" to also include another question regarding the Medical College's alleged negligence.

¶ 238. Finally, they maintain that because Beauchaine/OHIC failed to introduce expert testimony to a reasonable degree of medical certainty regarding whether the Medical College acted below the standard applicable to it, and whether such negligence caused Sarah's injuries and death, she failed to satisfy the requisite expert testimony for such a question on the special verdict.

¶ 239. We again cannot agree with Beauchaine/OHIC. First, contrary to Beauchaine/OHIC's assertion that the trial court improperly refused to include a question about the Medical College's alleged negligent supervision on grounds that the Hegartys had settled with the Medical College, the real reason why the court refused to grant the belated request was Dr. Beauchaine's unamended interrogatory response denying any negligence on the part of the Medical College, *see* WIS. STAT. § 804.12,[45] and because it would have been cumulative.

---

[45] WISCONSIN STAT. § 804.12 provides, in relevant part:

**Failure to make discovery; sanctions.**

. . . .

(2) FAILURE TO COMPLY WITH ORDER. (a) If a party or an officer, director, or managing agent of a party or a person designated to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under sub. (1) or s. 804.10, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

2. An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the disobedient party from introducing designated matters in evidence.

¶ 240. We agree fully with the Hegartys that the trial court properly relied on the interrogatory response. Perhaps even more significantly, as the Hegartys note, Beauchaine/OHIC never raised a claim of negligent supervision on the part of the Medical College in her answers and did not bring a cross-claim on the issue. This is dispositive. As with the last-minute implication from Dr. Schmidt's proffered testimony that third-year residents were negligent, the issue of negligent supervision by the Medical College was also sprung upon the Hegartys at the very last minute. The trial court properly refused to allow the late addition.

¶ 241. *Connar* and *Langhoff*, cited by Beauchaine/OHIC, are immaterial because the propositions cited apply only in situations where the issue was properly raised in the first place. As explained, that was not the case here.

¶ 242. We are satisfied that the trial court did not err in refusing to include a question about the Medical College's alleged negligent supervision based on Beauchaine/OHIC's failure to timely raise the issue. We thus need not address whether the question is cumulative. *See Hoffman*, 227 Wis. at 300 (unnecessary to address non-dispositive issues).

## g. *New Trial in the Interests of Justice*

¶ 243. Finally, Beauchaine/OHIC contend that the cumulative errors of the trial court necessitate a new trial in the interests of justice.

¶ 244. In post-verdict motions, Beauchaine/OHIC moved for a new trial in the interests of justice. The trial court denied the motion, stating:

> [S]he has the burden of showing, Beauchaine, the jury's finding was contrary to the greater weight and clear

preponderance of the evidence, even though the findings are supported by credible evidence in order to grant a new trial which is justice. Well, that isn't going to happen here . . . [she] has not met that burden.

The jury's findings, as I indicated time and time again, was a good verdict based on these facts.

¶ 245. Beauchaine/OHIC reference the following comment by the trial court at the beginning of trial: "There is [sic] $3,000,000 in specials, medical expenses. So this is a big case, okay. So get prepared for it, and get prepared to be able to do your duty. I'm sure you will one way or the other." Beauchaine/OHIC assert that "Beauchaine's case went downhill from there." Citing *State v. Albright*, 98 Wis. 2d 663, 677, 298 N.W.2d 196 (Ct. App. 1980), they maintain that the cumulative errors necessitate a new trial because while each of the rulings reviewed above were erroneous and prejudicial, warranting a new trial, "the cumulative effect of these rulings *guaranteed* the result" (emphasis in brief). They claim favorable evidence and evidence that would have contextualized Dr. Beauchaine's decisions was excluded or severely limited, other actors were "let off the hook," and the relevant time period was constrained "so as to isolate and thus exaggerate Beauchaine's relative responsibility."

¶ 246. The Hegartys disagree that a new trial is required. First, they disagree with Beauchaine/OHIC's reasoning and contend that "[r]ather than challenging the evidence, they set forth a litany of complaints regarding the exclusion or limitation of evidence favorable to Beauchaine, and the 'exaggeration' of her responsibility." As to the trial court's comment about this being a "big case," the Hegartys contend that it merely "impressed on the prospective jurors the importance of their duty."

¶ 247. A new trial may be granted in the interests of justice only when the jury findings are contrary to the great weight and clear preponderance of the evidence. *Krolikowski v. Chicago Northwestern Transp. Co.*, 89 Wis. 2d 573, 580, 278 N.W.2d 865 (1979). The trial court's decision of whether or not to grant a new trial will not be disturbed on appeal in the absence of a clear showing of an erroneous exercise of discretion. *See Larry v. Commercial Union Ins. Co.*, 88 Wis. 2d 728, 733, 277 N.W.2d 821 (1979). We exercise our discretionary power to grant a new trial infrequently and judiciously. *See State v. Ray*, 166 Wis. 2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992).

¶ 248. We disagree with Beauchaine/OHIC's final contention that a new trial is needed in the interests of justice based on the cumulative prejudicial effect of the errors they have alleged. For the reasons set forth in the foregoing sections, we have already determined that the trial court did not err, and it follows that Beauchaine/OHIC's claim of a cumulative error is without merit. *Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976) ("Zero plus zero equals zero."). The court's remark about this being a "big case" does not change this conclusion. No new trial is required in the interests of justice.

*C. The Hegartys' Cross-Appeal*

 *1. Reduction of Damage Awards against Beauchaine and OHIC by 25%*

¶ 249. The Hegartys contend that the trial court erred in reducing the jury's damage awards against Dr. Beauchaine and OHIC by 25%, representing the per-

centage of causal negligence attributed by the jury to dismissed party Dr. Stremski.

¶ 250. On October 1, 2004, the eve of trial, the Hegartys settled with a number of defendants, including the Fund, the Medical College, and a number of doctors from the Medical College, including Dr. Stremski. The defendants not party to this agreement that remained were: MCWAH, Children's, OHIC and Dr. Beauchaine. After the settlement agreement was reached, OHIC made numerous requests for copies of the agreement, including a motion for reconsideration of the court's original denial of their request, a writ of mandamus to compel the Fund to release a copy under the Wisconsin open records law, a request under WIS. STAT. § 893.55(7), and a motion after verdict. All of OHIC's attempts were denied.

¶ 251. As mentioned, the jury attributed 75% of the causal negligence to Dr. Beauchaine and 25% to Dr. Stremski. In motions after verdict, OHIC requested that the verdict against it and Dr. Beauchaine be reduced by 25%, to reflect the percentage of causal negligence the jury had assigned to Dr. Stremski. The trial court agreed and reduced the Hegartys' total verdict by 25%. The court gave the following explanation:

> Now as to the effect of the release and so on and how I will deal with that, I know there is a doctrine of joint and several liability. It is presumed that and is based on the premise on the belief that innocent victims should not suffer the loss caused by immune or insolvent wrongdoers, or other wrongdoers are also liable.
>
> This case is really an anomaly I think in many ways. I haven't seen a case like this where we have a capped and an uncapped party . . . . The plaintiff settled with Stremski and others. And really I think gave up

the 25 potential percent that Stremski, they didn't know what the percentage would be. But whatever findings of negligence would be against any of the parties that were named they gave that up I think by settling. They took a chance.

Now to say I should say, well they are jointly and severally liable, they should get back on that even though they settled . . . I don't think that's right. It is not proper under these facts under the circumstances. They gave it up, the 25 percent by settling.

¶ 252. First, the Hegartys insist that Dr. Beauchaine and OHIC are jointly and severally liable for 100% of the Hegartys' damages. Under WIS. STAT. § 895.045, "[a] person found to be causally negligent whose percentage of causal negligence is 51% or more shall be jointly and severally liable for the damages allowed." The Hegartys thus contend that because the jury found Dr. Beauchaine to be 75% causally negligent, "she (and her insurer OHIC) are jointly and severally liable for *all* of the damages awarded to the Hegartys" (emphasis in brief).

¶ 253. Second, the Hegartys explain that Dr. Beauchaine and OHIC are not entitled to a 25% reduction in the damages because their settlement agreement was not a *Pierringer* release,[46] and did not release any claims or parties or extinguish Dr. Beauchaine's and OHIC's contribution rights against Dr. Stremski.

---

[46] As explained by the supreme court in *VanCleve*:

[A] Pierringer release, in effect, limits a second joint tort-feasor's liability to the amount reflecting its proportion of wrongdoing. Stated differently, a Pierringer release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants.

203

The Hegartys list the following as having been agreed to in the settlement agreement:

- no parties were released;

- the Hegartys and Milwaukee County covenanted not to sue the settling defendants;

- the parties expressly agreed that the settlement agreement was not a *Pierringer* release, not to be constructed as such;

- the Hegartys expressly reserved all claims against Beauchaine and OHIC;

- the Hegartys never agreed to indemnify or hold any of the settling defendants harmless with respect to any contribution claims that Beauchaine and OHIC may bring;

- Beauchaine's and OHIC's contribution rights were in no way prejudiced; and

- the settlement was not intended to credit or satisfy any percentage of liability that the settling defendants may be assigned of the total damages suffered by the Hegartys and Milwaukee County in the event of a verdict.

(Footnote omitted.) Having described the agreement in the above manner, the Hegartys explain that it is a credit agreement, specifically designed to not be a *Pierringer* release, "so that the Hegartys would not end up 'eating' whatever percentage of causal negligence might be attributable to the settling health care providers following a trial." They also complain that in reducing their verdict, "the circuit court did not determine

*VanCleve*, 258 Wis. 2d 80, ¶ 39 (citing *Pierringer*, 21 Wis. 2d at 193) (footnote omitted).

that the settlement agreement constituted a *Pierringer* release, authorizing such a reduction, but rather simply ruled, without explanation, that the Hegartys 'took a chance' and 'gave that up by settling.' " Hence, they maintain that, because they reserved all their claims and rights of recovery, and never agreed to indemnify or hold any of the settling defendants harmless with respect to any subsequent contribution claim, there is no basis for construing the agreement as a *Pierringer* release, entitling Dr. Beauchaine and OHIC to a 25% reduction in the damages or extinguishing their contribution rights against Dr. Stremski.

¶ 254. Based upon these two assumptions—that Dr. Beauchaine and OHIC are jointly and severally liable, and that the settlement agreement is not a *Pierringer* release—the Hegartys reach their actual argument: that Dr. Beauchaine and OHIC are entitled to a credit of only $840,046.33 from Dr. Stremski because that is the amount to which they would be entitled in a subsequent contribution action, and also the amount the Hegartys would have been able to recover from him directly, had he not been dismissed. They reach this figure by asserting that, pursuant to *Maurin*, which held that when medical malpractice results in death, the only case for loss of society and companionship that can be brought is a wrongful death claim under WIS. STAT. § 895.04(4), Dr. Stremski, a WIS. STAT. ch. 655 health care provider, is immune for pre-death noneconomic damages. Therefore, the argument goes, his liability for noneconomic damages was thus limited to those awarded for wrongful death (post-death) loss of society and companionship. Because the award for post-death loss of society and companionship was $150,000 and because Stremski was determined to be 25% at fault, he would have been responsible for only

205

$37,500, not $373,750.[47] The Hegartys do not contest the 25% reduction of the $3,210,185.31 award for economic damages (medical expenses and funeral and burial expenses), or $802,546.32, because Dr. Stremski's liability for economic damages, unlike noneconomic ones, is uncapped. Thus, their final calculation for the amount the Hegartys could have recovered from Stremski, had he not settled, for which Dr. Beauchaine and OHIC had a right of contribution, is: $802,546.32 (economic damages) + $37,500 (noneconomic damages) = $840,046.32.

¶ 255. OHIC and Beauchaine/OHIC's[48] responses are similar, both contending that the Hegartys' arguments are premature.

---

[47] The Hegartys insist that this situation is no different than one in which a person determined to be causally negligent is immune or bankrupt where a joint tortfeasor found to be 51% or more at fault remains liable for 100% of the damages awarded, even though he/she is prevented from recovering contribution from the bankrupt or immune tortfeasor. Thus, because under *Maurin* Dr. Stremski is immune from liability for pre-death noneconomic damages, "[a]s between the innocent Hegartys and the adjudged wrongdoer Beauchaine, Beauchaine and her insurer OHIC should have to shoulder the difference between 25% of the total noneconomic damages awarded and the maximum liability of Stremski under the law of $37,500."

Moreover, as mentioned in footnote 33 of this opinion, in *Bartholomew*, our supreme court recently overturned the portion of *Maurin* relied upon by the Hegartys, holding that: "*Maurin*'s interpretation of Wisconsin's medical malpractice and wrongful death statutes as imposing a single global wrongful death cap on all noneconomic damages is flawed because it failed to take into account the well-established distinction in Wisconsin tort law between actions for predeath damages and actions for postdeath damages (wrongful death actions)." *Id.*, 717 N.W.2d 216, ¶¶ 35–51, 127.

[48] OHIC and Beauchaine/OHIC submitted separate but similar briefs.

¶ 256. OHIC submits that the Hegartys' argument that the settlement agreement was a "credit agreement," rather than a *Pierringer* release, are based solely on their interpretation of the agreement, since OHIC has been denied access to them, and that it is now placed in an impossible position of having to make arguments about a document that it has not been permitted to see. Explaining that it is unwilling to accept the Hegartys' representations as to the effect of the settlement agreement, OHIC adds that the fact that the terms of the settlement agreement form the basis of the Hegartys' cross-appeal underscores its importance. OHIC therefore maintains that it is entitled to independently review the agreement to determine the effect of the agreement's terms and asks this court to order the production of the documents and to remand the case to the trial court.

¶ 257. Beauchaine/OHIC similarly contend that because they never saw the settlement agreement, they cannot evaluate the Hegartys' characterization of its terms and effect, and that the Hegartys are therefore estopped from arguing that the terms of the settlement preserved their right to collect the entirety of the judgment.[49] Beauchaine/OHIC add that, "[w]hile the Hegartys summarize their interpretation of portions of

[49] In a footnote, Beauchaine/OHIC make the following accusation: "There is little doubt why the Hegartys made this decision. The agreement likely demonstrated the bias – and perhaps express cooperation – of the parties to the agreement, all of which contributed to the Hegartys' efforts at trial to isolate and condemn Beauchaine and, therefore, increase the possibility of obtaining an uncapped verdict." Because we are remanding this issue to the trial court, we decline to comment on what the settlement agreement might or might not demonstrate.

207

the settlement agreement in their cross-appeal, they do not quote from or attach the agreement itself."

¶ 258. To reach the merits of the Hegartys' ultimate argument, it would be necessary for us to first agree with the two conditions that the Hegartys set forth: that Dr. Beauchaine is jointly and severally liable, and that the settlement agreement was not a *Pierringer* release. This we cannot do.

¶ 259. The problem with the Hegartys' argument is that they have refused to disclose the substance and details of their settlement agreement with Dr. Stremski and the other settling defendants to OHIC and Dr. Beauchaine. In their reply brief, the Hegartys insist that OHIC's and Beauchaine/OHIC's arguments that the Hegartys should be estopped from arguing that the trial court erred in reducing the jury's verdict by 25% because they refused to turn over the settlement agreement is "ludicrous." They instead note that nothing requires automatic disclosure of settlement agreements, referencing the fact that they filed the agreement with the trial court under seal for *in camera* review.

¶ 260. While the Hegartys are correct in that there is no authority requiring automatic disclosure of confidential settlement agreements, and while they did file the agreement with the trial court, this argument ignores the essence of OHIC's and Beauchaine/OHIC's qualm about the Hegartys' argument that doing so still deprives them of the right to review the document. We agree with OHIC that because the terms of the settlement agreement constitute the basis of the Hegartys' cross-appeal, it is impossible for them to formulate a response without simply trusting the Hegartys' interpretation of the documents. As Beauchaine/OHIC note,

this is especially so given that, rather than quoting from the agreement, the Hegartys merely summarize their interpretation of portions of the settlement agreement. The Hegartys suggest that, like the trial court, this court should review the agreement and construe its terms to resolve the issue. As already discussed in Section A.4 of this opinion, we did review the document and determined that the trial court did erroneously exercise its discretion in refusing to compel the document's disclosure, and consequently ordered its disclosure to OHIC.

¶ 261. For these reasons, we conclude that the Hegartys are estopped, at this time, from arguing that the terms of their settlement agreement preserved their right to collect the entirety of their judgment against Dr. Beauchaine and OHIC. Because we resolve this issue based on estoppel due to the non-disclosure of the settlement agreement, and note that an argument based on the terms of the agreement is entirely premature, we need not address the issue of joint and several liability and hence, do not reach the merits of the Hegartys' argument. Because we are ordering the production of the settlement agreement, we remand this issue to the trial court for further proceedings.

### 2. Recovery of Past Medical Expenses Limited to Amount Paid

¶ 262. The Hegartys contend that the trial court erred in limiting their recovery of past medical expenses to the amount actually paid by involuntary plaintiff Milwaukee County.

¶ 263. Milwaukee County, the employer of Jeremiah Hegarty, and thus Sarah's insurer, and an involuntary plaintiff in this case, paid approximately $2.5 million in medical expenses for Sarah. The actual

amount billed by Sarah's health care providers was approximately $3.2 million, but pursuant to an agreement that Milwaukee County reached with Sarah's health care providers, the actual amount paid was only $2.5 million.

¶ 264. Prior to trial, the Hegartys moved *in limine* to preclude any evidence, argument or testimony regarding medical bills that were paid by health insurance, citing *Koffman v. Leichtfuss*, 2001 WI 111, 246 Wis. 2d 31, 630 N.W.2d 201, and *Ellsworth v. Shelbrock*, 2000 WI 63, 235 Wis. 2d 678, 611 N.W.2d 76, which established that under the collateral source rule, an injured party may recover the reasonable value of medical services and the subrogated amount will be deducted from this recovery and the injured party is entitled to the remainder.

¶ 265. At the hearing on the motion on October 1, 2004, the Hegartys asked the court to make a factual finding as to the reasonable value of Sarah's medical expenses, and to "fill in the sum of $3.2 million" on the special verdict form, adding that "the court, on motions after [verdict] on the damages, can make a legal determination of whether it's the amount incurred or the amount paid." Neither OHIC nor Dr. Beauchaine opposed the motion, and only the Fund, which at the time was still a party, objected to the motion. Counsel for Dr. Beauchaine responded:

> My understanding with regard to damages, we didn't have any intent to object certainly to the reasonableness, necessity of what is billed. It's just in this incident there are two numbers, one of which is the amount that was generated or billed, the other being the amount that was paid. Under the circumstances, I think applicably under the law, that both numbers are presented

210

and that the jury is allowed to select in that regard in terms of the ultimate verdict question . . . .

¶ 266. The trial court made the following ruling:

These matters can be sorted out later, what was paid and what was actually incurred, and the jury need not speculate on this. The collateral source rule and legislation, . . . and the court is going to, in fact, so the jury knows the general scope of this without having to prove up each individual amount, that what the billed amounts were, and that will be put on the jury as a special damage verdict question. It will be inserted by the court telling the jury they need not worry about that issue.

¶ 267. This ruling was reduced to writing in the form of an order dated October 5, 2004, which stated:

2. That the motion of the plaintiffs precluding the defendants from introducing any evidence, argument or testimony regarding the medical bills that were paid by health or other insurance shall be and the same hereby is granted and the Court will enter the amount of $3,196,863.78 for past medical bills and expenses and $13,321.53 for funeral and burial expenses on the Special Verdict, and will advise the jury on the appropriate instruction regarding this item, and further, that the Court will decide the issue of whether the final amount of medical specials is the amount incurred or paid on Motions after Verdict.

¶ 268. Beauchaine/OHIC brought a motion after verdict regarding the value of medical expenses. The court ruled that the amount of medical damages that the Hegartys would be able to recover would be the amount paid, rather than the amount incurred, reducing the amount from $3,196,863.87 to $2,500,000. *See*

211

Wis. Stat. § 893.55(7). The court specifically explained that this ruling was in accordance with the collateral source rule.

¶ 269. The Hegartys contend that the trial court erred in applying Wis. Stat. § 893.55(7)[50] to reduce their recovery of medical expenses to a lesser amount actually paid by Milwaukee County pursuant to an agreement with Sarah's health care providers, rather than allowing them to recover the fair and reasonable value of the medical care received.

¶ 270. They contend that the court's application of Wis. Stat. § 893.55(7) was erroneous because the statute has no application outside of Wis. Stat. ch. 655, and therefore does not apply to Dr. Beauchaine, who was an unlicensed first-year resident. They refer to *Phelps*, where this court held (and the supreme court later affirmed) that an unlicensed first-year medical resident is not a "health care provider" for purposes of ch. 655. *Id.*, 273 Wis. 2d 667, ¶¶ 30–31. Under that reasoning in *Phelps*, this court also held that since first-year residents are not ch. 655 "health care providers," they are also not entitled to the benefits of the noneconomic damage cap under § 893.55(4)-(5). *Phelps*, 273 Wis. 2d 667, ¶ 41. The Hegartys point to the fact that in reaching this conclusion in *Phelps*, this court noted the difference between the more expansive meaning of "health care provider" in § 893.55(1)-(3) and the more narrow one in § 893.55(4)-(5), *Phelps*, 273 Wis. 2d 667, ¶ 44; *see also Phelps*, 282 Wis. 2d 69, ¶¶ 58–64,

---

[50] Wisconsin Stat. § 893.55(7) provides:

Evidence of any compensation for bodily injury received from sources other than the defendant to compensate the claimant for the injury is admissible in an action to recover damages for medical malpractice. This section does not limit the substantive or procedural rights of persons who have claims based upon subrogation.

and submit that just like § 893.55(4) and (5) have no application outside ch. 655, neither does § 893.55(7).

¶ 271. The Hegartys brief-in-chief was submitted before the supreme court issued its decision in *Lagerstrom*, 285 Wis. 2d 1, ¶ 27. Acknowledging that in *Lagerstrom* a challenge to WIS. STAT. § 893.55(7) was pending before the Wisconsin Supreme court, the Hegartys' remaining arguments were based on the state of the law at the time.

¶ 272. On July 14, 2005, before OHIC and Beauchaine/OHIC filed their response, the supreme court issued its decision in *Lagerstrom*. The court held that even though collateral source payments do not automatically reduce the amount of medical expenses, a fact-finder may use collateral source evidence "to determine the reasonable value of medical services." *Id.*, 285 Wis. 2d 1, ¶ 27.

¶ 273. Based on *Lagerstrom*, OHIC and Beauchaine/OHIC[51] respond that the trial court properly concluded that the reasonable value of the medical expenses was the $2,500,000 that was paid, not the approximately $3,200,000 that had been charged. They explain that because WIS. STAT. § 893.55(7) encompasses "payments, write-offs, or forgiveness made directly to health care providers," and under *Lagerstrom* evidence of the agreement between Milwaukee County and Sarah's health care providers may be used by the fact-finder in determining the reasonable value of medi-

---

[51] In this section, Beauchaine/OHIC's and OHIC's briefs are nearly identical where certain sections of text appear in dissimilar orders, but where long passages are verbatim recitations of the other party's brief. Therefore, their arguments will not be separated. The quoted passages appear in both briefs.

cal expenses, *id.*, ¶¶ 28–30, the trial court properly applied § 893.55(7) in determining the reasonable value of medical services.

¶ 274. OHIC and Beauchaine/OHIC disagree that Dr. Beauchaine is not a "health care provider" under Wis. Stat. ch. 655, and claim the argument "ignores the substance of the case" because "even though the Hegartys argue that one of those defendants was not a 'health care provider' as defined under Ch. 655, the fact remains that the jury and circuit court heard and decided a medical malpractice trial." They add that the trial court explicitly noted that it considered the collateral source rule in making its decision.

¶ 275. In their reply, the Hegartys concede that, pursuant to *Lagerstrom*, health insurance payments are subject to Wis. Stat. § 893.55(7), and that the case resolved, adversely to them, most of their challenges to the reduction of past medical expenses to the amount paid by Milwaukee County. They observe, however, that *Lagerstrom* did not resolve their argument that § 893.55(7) has no application to non-Wis. Stat. ch. 655 health care providers like Dr. Beauchaine. They thus reiterate that because *Phelps* differentiated between § 893.55(4)-(5) and Wis. Stat. § 893.55(1)-(3), *see* *Phelps*, 273 Wis. 2d 667, ¶ 44, the legislature "clearly" intended the term "health care provider" in § 893.55(7) to be interpreted in the same manner as it is in § 893.55(4), (5) and (6). They therefore submit that, under *Phelps*, "[b]ecause the collateral source rule has not been abrogated in medical malpractice cases against non-chapter 655 health care providers," Dr. Beauchaine's liability for past medical expenses should not have been reduced to the amount paid by Milwaukee County.

¶ 276. We disagree that the trial court erred in reducing the award to the amount paid pursuant to Wis. Stat. § 893.55(7). It is undisputed that Dr. Beauchaine was not a Wis. Stat. ch. 655 health care provider at the time she treated Sarah and, as such, *Phelps* precludes her from being subject to the § 893.55(4) caps. However, even if we were to agree with the Hegartys' reasoning for why Dr. Beauchaine should not be subject to § 893.55(7) and why the collateral source rule should apply, the fact remains that the reduction of the amount of medical expenses affected not only the amount of the final judgment against Dr. Beauchaine, it also affected the 25% credit that was given in light of the causal negligence attributed to Dr. Stremski. Dr. Stremski is clearly a ch. 655 health care provider, and, as such, he is indisputably subject to § 893.55(7).

¶ 277. This leaves us with a situation where one physician clearly is subject to Wis. Stat. § 893.55(7), while another may or may not be. In light of this scenario, we agree with OHIC and Beauchaine/OHIC's approach of looking at the big picture; that is, the fact that the Hegartys brought a medical malpractice case against multiple health care providers and their employees for what they alleged was negligent medical care that caused Sarah's death. We conclude that when the applicability of § 893.55(7) to one of the physicians whose negligence caused Sarah's injuries and death is unknown, the fact that the other causally negligent physician was an undisputed Wis. Stat. ch. 655 health care provider dictates the application of § 893.55(7). Thus, because Dr. Stremski, per *Lagerstrom*, was unquestionably not subject to the collateral source rule,

215

we need not decide whether Dr. Beauchaine is in fact subject to § 893.55(7), but resolve the issue based on Dr. Stremski's status.

¶ 278. Consequently, the trial court did not err in reducing the reasonable value of medical services to the amount paid by Milwaukee County.

*3. Statutory Interest*

¶ 279. Lastly, the Hegartys contend that the trial court erred in refusing to assess statutory interest against OHIC pursuant to WIS. STAT. § 628.46, based on its failure to timely pay their claim.

¶ 280. In their post-verdict motions, the Hegartys moved for a twelve-percent award of statutory interest under WIS. STAT. § 628.46, on the medical expenses accruing from the date OHIC was served with the complaint, December 23, 1998, until to the day before the Hegartys served their offer of settlement, July 12, 2000. Under § 628.46,[52] all insurers "shall promptly pay

---

[52] WISCONSIN STAT. § 628.46(1) provides:

Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss. If such written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after written notice is furnished to the insurer. Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any claim is overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the U.S. mail in a properly addressed,

every insurance claim," and if an insurer fails to pay any portion of a claim within thirty days, that payment is considered overdue, authorizing twelve percent interest per year. *Id.* The Hegartys' motion was based on the fact that their complaint gave written notice to OHIC of the amount of Sarah's medical bills and the procedures she had undergone, and specifically requested judgment "[f]or all costs, disbursements and actual attorney's fees, and all interest due and owing pursuant to sec. 628.46 Wis. STAT." The trial court rejected the Hegartys' motion, stating:

> [A]s to the interest, the Court is not going to grant any on the medical [expenses] submitted to the insurance company at that earlier date. I think it would be impossible to say that under these facts that insurance company should have come up with this, these costs right away without determining whether who was liable for them at that time, or at any point until I think there was legitimate objections throughout this trial and who might be liable for that and under what circumstances. So, to say that they should have paid this amount because it was delineated, and they didn't pay it, therefore interest should run, the Court is not going to rule that way. I think under the facts of this case, it would be improper to do so.

¶ 281. The Hegartys contend that the trial court erred in refusing to assess statutory interest against OHIC pursuant to Wis. STAT. § 628.46, based on its failure to timely pay the Hegartys' claim. They submit that even though § 628.46 is an "all-inclusive statute requiring all insurance companies to promptly pay all claims," *Fritsche v. Ford Motor Credit Co.*, 171 Wis. 2d

postpaid envelope, or, if not so posted, on the date of delivery. All overdue payments shall bear simple interest at the rate of 12 per year.

280, 304, 491 N.W.2d 119 (Ct. App. 1992), it is limited by § 628.46(3), which provides: "This section applies only to the classes of claims enumerated in s. 646.31(2)." Section 646.31(2), in turn, provides, in relevant part:

> **(2)** CLASSES OF CLAIMS TO BE PAID. No claim may be paid under this chapter unless the claim is in one of the following classes:
>
> . . . .
>
> (d) *Third party claimants.* A claim under a liability or workers' compensation insurance policy, if either the insured or the 3rd party claimant was a resident of this state at the time of the insured event.

¶ 282. At the time the Hegartys filed their brief-in-chief, this court had recently held in *Kontowicz v. American Standard Insurance Co. of Wisconsin*, 2005 WI App 22, 278 Wis. 2d 664, 693 N.W.2d 112, that WIS. STAT. § 628.46 does not apply to third-party liability claims in personal injury cases. *Kontowicz*, 278 Wis. 2d 664, ¶ 23. Acknowledging *Kontowicz* as barring their claim of statutory interest, they made their argument to preserve the issue for possible review by the supreme court.

¶ 283. Beauchaine/OHIC's and OHIC's responses refer to our decision in *Kontowicz* asserting that the holding bars claims for statutory interest under WIS. STAT. § 628.46. Recognizing that the supreme court had granted a petition for review, OHIC addresses the merits of the Hegartys' argument. OHIC maintains that the Hegartys' claim fails because there was "reasonable proof" that OHIC was not solely responsible, and under 628.46, "Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment." Specifi-

cally, the complaint named as defendants not only Dr. Beauchaine and OHIC, but also six other entities, including another insurance company, some of whom did not settle until the eve of trial, and the complaint contained allegations against individuals and entities that OHIC did not insure. OHIC also remarks that the Hegartys made claims for damages to two different insurance companies, OHIC and PIC, and thus maintain that even if the Hegartys' claim is sufficient to trigger application of the statute, the fact that they submitted identical claims to two different insurers is reasonable proof that even they were not sure who would be liable for the medical expenses.

¶ 284. In their reply brief, the Hegartys request that a briefing schedule be set in the event the supreme court reverses.

¶ 285. On May 18, 2006, the supreme court released its decision in *Kontowicz*, reversing the decision of the court of appeals, and holding that under certain circumstances, Wis. Stat. § 628.46 does apply to third-party liability claims for personal injury. *Kontowicz v. American Standard Ins. Co. of Wis.*, 2006 WI 48, ¶ 48, 290 Wis. 2d 302, 714 N.W.2d 105. The court explicitly limited its holding "to only those situations in which three conditions to trigger interest are met," namely: "First, there can be no question of liability on the part of the insured. Second, the amount of damages must be in a sum certain amount. Third, the claimant must provide written notice of both liability and the sum certain amount owed." *Id.*, ¶ 48. The court added that the insurer need only provide "reasonable proof" that it is not responsible for § 628.46 not to apply. *Id.*

¶ 286. Although the test delineated by the supreme court in *Kontowicz* was not known to the parties at the time of briefing, we do not deem it necessary to

remand the matter to the trial court for further briefing, and apply the test to the case based on the record before us.

¶ 287. *Kontowicz* involved two plaintiffs, Debra Kontowicz, who was rendered a quadriplegic as a result of an automobile accident in which she was struck from behind by Daniel Jeffers, and Larry Buyatt, who was injured in an automobile collision solely caused by the negligence of Jason Schoessow. *Id.*, ¶¶ 3, 11. The insurance claims were brought against Jeffers's and Schoessow's respective liability insurers, American Standard and Metropolitan.

¶ 288. With respect to Kontowicz, the court concluded that she had met all the statutory notice requirements and informed the insurer of the amount, satisfying factors two and three. *Id.*, ¶ 53. Applying the first factor"no question of liability on the part of the insured"the court determined that "[t]here was no question of the liability of American Standard's insured," explaining that:

> American Standard knew about the accident involving Jeffers and Kontowicz, that Jeffers was at fault, and that Kontowicz was apparently paralyzed. Jeffers conceded liability in his answer to the interrogatories. American Standard had investigated the accident, and determined that once Kontowicz's severe injury was confirmed, in light of the admitted liability on the part of Jeffers, that it was liable under its policy.

*Id.*, ¶ 53 (footnote omitted). Therefore, the court held that Kontowicz was entitled to interest.

¶ 289. With respect to Buyatt, Metropolitan had admitted that Schoessow was the sole cause of the Buyatt's injuries. *Id.*, ¶ 14. Applying the first factor with respect to Buyatt, the court concluded that "Metropoli-

tan had knowledge of clear liability for the accident."
*Id.*, ¶ 54. However, with respect to the second factor, the
court explained that:

> [B]ecause Metropolitan had information that there
> were pre-existing injuries of a similar nature, as well as
> similar injuries subsequent to the Schoessow accident,
> and it was fairly debatable as to whether the wage loss
> and medical specials were *all* attributable to the Schoe-
> ssow accident, we determine that Metropolitan had
> reasonable proof to establish that it was not responsible
> for at least a portion of Buyatt's claim. The amount that
> it was responsible for could not be determined with any
> certainty. Therefore, interest under Wis. Stat. 628.46 is
> not appropriate in Buyatt's case.

*Id.*, ¶ 54 (emphasis in original).

¶ 290. Contrasting these two scenarios to the case
before us, we are satisfied that the Hegartys do not
satisfy the *Kontowicz* test. As of December 23, 1998, the
date from which the Hegartys seek interest, OHIC was
merely a named defendant in the lawsuit. Especially
since, as OHIC notes, among the named defendants
were entities not insured by OHIC as well as another
insurance company, some of whom did not settle until
the eve of trial, there was most definitely a "question of
liability on the part of the insured." *Id.*, ¶ 48. Unlike
*Kontowicz*, where Jeffers conceded liability and where
it was clear that Schoessow was at fault, here, liability
was not established until the jury so found. Because all
three conditions have to be met, we need not reach the
other two factors. *Id.* We are therefore satisfied that
interest under Wis. Stat. § 628.46 is not appropriate in
this case.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.

¶ 291. FINE, J. (*concurring in part; dissenting in part*). I join in the Majority opinion except paragraphs 262–278.

¶ 292. The trial court did not use the amount actually paid by Milwaukee County in determining "reasonableness"; it used it as the measure of recovery even though the parties agreed that the higher, billed, figure was "reasonable." I also disagree with the Majority's decision to apply WIS. STAT. § 893.55(7) to Beauchaine even though she is not under WIS. STAT. ch. 655. Accordingly, I would reverse that part of the judgment that reduced the Hegartys' medical-expense recovery.